# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOAN Y. SUMMY-LONG,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:06-cv-1117** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **PENNSYLVANIA STATE** | : | |
| **UNIVERSITY et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court is Defendants' motion for partial summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). (Doc. No. 41.) The motion has been fully briefed and is ripe before the Court for disposition. For the reasons that follow, the motion will be granted in part and denied in part.

## I.      BACKGROUND

Plaintiff, Joan Y. Summy-Long, Ph.D., is a Professor in the Department of Pharmacology with the Penn State College of Medicine in Hershey, Pennsylvania ("COM"), a division of the Pennsylvania State University ("PSU"). (Doc. No. 1.) Plaintiff has held a faculty position at COM since 1978. (Doc. No. 43 ¶ 2.) In her complaint, Plaintiff claims that Defendants have engaged in gender discrimination with respect to compensation, terms, conditions, and privileges of employment for a period in excess of 20 years. (Doc. No. 1 ¶ 20.)

**The College of Medicine's Compensation System**

COM faculty receive a base salary, which is reviewed annually. Base salaries are augmented annually pursuant to a University-wide salary increase percentage established by the PSU President. (Doc. No. 43 ¶¶ 35-43.) Upon promotions from Assistant Professor to Associate

Professor and from Associate Professor to Professor, faculty members typically receive an eight percent base salary increase. (Id. ¶ 41.) An individual professor's base salary may also be increased by a "research incentive," which is an additional amount based on the level of external grant funding obtained by the faculty member under review. (Id. ¶ 48.)

**Faculty Senate Salary Studies**

Over the years, multiple reports and analyses have been undertaken to address salary disparity and compensation at PSU and COM. In the years 1984, 1996-1999, 2001, and 2003, the Penn State Faculty Senate ("Senate") conducted salary reports to which all professors at PSU had access. (Id. ¶ 65.)

The 1984 study noted a gender-based disparity in salary of between $500 and $1,000, but COM faculty was not included in the study. (Id. ¶¶ 71-74.) The 1996 report provided mean and median salary figures for standing faculty members at COM for the academic year beginning in 1994. Plaintiff's salary was lower than the mean salary reported for COM professors. (Id. ¶¶ 75-78.) The 1997 study, which also included COM faculty, observed "no significant differences" in salary by gender throughout the University "with the exception of Hershey [COM] where male faculty appeared to have notably higher salaries." (Id. ¶¶ 80-82.) In 1998, the Senate released a COM addendum to its 1997 report that addressed only COM salaries. (Id. ¶¶ 84-85.) The report confirmed the finding that there was an unexplainable difference in salaries between men and women. (Id. ¶ 89.) The addendum added that the differences "appear to be significant and do not appear to be explained by time in rank or the proportion of men/women in clinical departments." (Id. ¶ 90.) In 1999, the Senate released another report that recognized a salary disparity between genders and acknowledged that the difference could not be fully explained by differences in

years in rank. (Id. ¶ 95.) Plaintiff acknowledges that she was aware of the results of the 1997 and 1999 salary studies by June 30, 2001, at the latest. (Id. ¶ 96.)

Another report was released in 2001. The 2001 report disclosed the mean and median salaries of COM science faculty during the 2000-2001 academic year. (Id. ¶ 98.) During that academic year, Plaintiff's salary was more than $15,000 lower than the mean salary for COM basic science professors. (Id. ¶ 99.) In 2003, the Senate released another salary report that provided mean salary data for COM faculty, this time for the 2002-2003 academic year. (Id. ¶ 101.) The 2003 report did not delineate salary data on the basis of gender. (Id.) The tables in the report demonstrated, however, that Plaintiff's salary was more than $20,000 lower than the mean salary reported for standing COM professors with a Ph.D. or other doctoral degree, and $15,000 lower than other Pharmacology Professors at COM. (Id. ¶¶ 102, 106.)

**The Commission for Women**

The Commission for Women ("CFW") is a University-wide group that advises the President of the University on matters affecting women at PSU. (Id. ¶ 69.) Plaintiff served as a member of the CFW from July 1998 through June 2001. (Id. ¶ 70.) In 1999, the CFW issued a salary report that analyzed salaries for the academic year ending in 1998. (Id. ¶ 108.) The report concluded that no significant differences in salaries due to gender were found at University Park, but that females at non-University Park locations earned significantly lower salaries than males. (Id. ¶¶ 108-09.) COM salaries were not included in this analysis because "the high salaries and large number of male faculty in the College of Medicine skewed the analysis too much." (Id. ¶ 110.)

**Human Resources Team**

Plaintiff also served on an administrative group designed to address human resources issues called COM's Human Resources Team ("HRT"). (Id. ¶ 167.) On December 20, 2000, Plaintiff made a presentation to the HRT regarding COM faculty salaries. (Id. ¶ 169.) At that time, she also prepared a report on gender differences in faculty salaries in COM, which outlined strategies to "correct . . . gender differences in salary." (Id. ¶¶ 170-71.) The HRT wrote a letter to Vice Dean for Faculty and Administrative Affairs Dr. Kevin Grigsby ("Grigsby") on July 10, 2001, requesting that an external salary study be conducted to remedy what other studies had identified as "salary inequities for basic scientists at the College of Medicine." (Id. ¶¶ 219-20.)

**The Women's Faculty Group**

Plaintiff, along with another doctor at COM, formed the Women's Faculty Group ("WFG") in 1999 to advocate for issues affecting women faculty. (Id. ¶¶ 174-75.) Shortly after its formation, WFG identified salary equity for women faculty as an important concern. (Id. ¶ 178.) In August of 2000, WFG discussed the disparate salary compensation issue at a meeting with COM Dean Darrell Kirch ("Dean Kirch") and again with Grigsby in October of that year. (Id. ¶¶ 180-85.).

In 2000, the University's Affirmative Action Office ("AAO") conducted an analysis of faculty salaries within COM's basic science departments. (Id. ¶ 188.) The study, released on July 21, 2000, concluded that "sex is not a significant factor in explaining salary in this population and there is no indication of systemic bias on the basis of sex." (Id. ¶¶ 189, 191.) WFG members did not accept the accuracy of this study. Instead, in a January 2001 memorandum addressed to Grigsby, WFG questioned the results of the 2000 AAO study in light of the previously-conducted studies by the Senate which had shown a gender bias to exist. (Id. ¶¶ 199-201).

In March of 2001, Wayne Zolko ("Zolko"), COM Controller, held a Faculty meeting where he presented mean and median salary figures for all COM scientists, categorized by the rank of Professor, Associate Professor, and Assistant Professor. (Id. ¶¶ 204-06). Following the meeting, Dr. Kathryn LaNoue ("LaNoue"), a WFG member, prepared a chart displaying the median and mean salary data reported by Zolko, and she asked each female faculty member to mark where her salary fell in comparison to the mean and median data. (Id. ¶¶ 207-08). Twenty of the twenty-two female faculty members who identified their salary on LaNoue's graph had a salary below the mean and median figures provided by Zolko. (Id. ¶ 209.)

Armed with LaNoue's chart, Plaintiff and other WFG members met with AAO Director Bonnie Ortiz ("Ortiz") and Associate President for Human Resources Billie Willitts ("Willitts") in April of 2001 to discuss their suspicions that the AAO study was inaccurate. (Id. ¶ 211.) Ortiz and Willitts explained their understanding that the salaries analyzed in the AAO study were limited to base salaries, with no research incentives or other supplements included. (Id. ¶ 212.) Plaintiff then showed LaNoue's chart to Ortiz and Willitts, suggesting that either the results of the AAO study or the data used therein were inaccurate when viewed in light of the salary information provided to the faculty by Zolko. (Id. ¶ 213.) Ortiz investigated the inconsistency and, in May of 2001, informed Plaintiff that the salaries analyzed in the AAO study were not limited to base salaries as she had believed, but instead included research incentive payments. (Id. ¶ 215.) Ortiz told Plaintiff on May 9, 2001, that the University was collecting data that would permit it to complete the salary analysis again, this time using only base salary figures. (Id. ¶ 216.) Though this follow-up study to the AAO study was begun by the Office of Human Resources ("OHR"), and the preliminary results showed the existence of gender bias in salaries,

Dean Kirch and Grigsby chose to hire an external consultant to conduct a more thorough study rather than to complete the OHR study. (Id. ¶¶ 230-32; Doc. No. 91 ¶ 2.) Dean Kirch and Grigsby did not disclose the preliminary findings of the OHR study to Plaintiff. (Doc. No. 91 ¶ 2.)

**Haignere Report**

On July 11, 2001, Plaintiff and other WFG members wrote a letter to Dean Kirch requesting that an outside consultant conduct a salary study "with special attention to gender bias." (Doc. No. 43 ¶¶ 218, 222.) The letter outlined the reasons WFG members felt that an external consultant was necessary, including their belief that "the problem of gender inequity has not been addressed satisfactorily" despite over ten years of Faculty Senate studies indicating a gender bias in salary. (Id. ¶¶ 222-23.) The letter also expressed that Plaintiff, and other WFG members, "have serious concerns regarding salary equity at the Penn State College of Medicine and Hershey Medical Center." (Id. ¶ 224.) Dean Kirch informed WFG members on August 22, 2001, that the suggestion to hire an external consultant was being considered. (Id. ¶ 226.) In November of 2001, Plaintiff was informed that the University had decided to hire an independent consultant to conduct a new salary study. (Id. ¶ 234.)

In January of 2002, COM retained Haignere, Inc. ("Haignere") to conduct an analysis of faculty salaries to determine whether salary disparities existed by gender or race. (Id. ¶ 235.) The Haignere study considered salaries in effect during the 2001-2002 academic year only. (Id. ¶¶ 244-45.) On October 14, 2003, Dr. Haignere presented the preliminary findings to WFG, Dean Kirch, and Grigsby. (Id. ¶ 252.) She found that a class-based salary disparity with respect to gender existed at COM. (Id. ¶ 255.) In response to Haignere's preliminary findings, Dean Kirch

stated that he accepted the truth of the findings, and that he intended to take corrective measures in the form of class-based salary adjustments. (Id. ¶¶ 257-58.)

On November 20, 2003, Plaintiff and other WFG members met with Dean Kirch and Grigsby to discuss the administration's plans to make salary adjustments. (Id. ¶¶ 262-64.) During this meeting, Dean Kirch stated that an across-the-board group adjustment would be made, but that "there is no expectation of making retroactive salary adjustments." (Id. ¶¶ 266-68.)

Haignere completed the final report of COM salary equity in June of 2004. (Id. ¶ 273.) After seeing the report, Dean Kirch stated that class-based salary adjustments would be made for the classes of faculty for whom Dr. Haignere found a statistical salary differential. (Id. ¶ 275.) He also proposed a longevity correction to account for past salary disparities. (Case No. 07-718 Doc. No. 37-3 at 3-9, 51.) By September 2004, however, Dean Kirch had again clarified that no longevity correction would be made. (Id.) Plaintiff, and all other tenured white female basic scientists, received a 3.8 percent salary adjustment retroactive to July 1, 2004. (Id. ¶ 280.)

**Procedural History**

On December 22, 2004, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") alleging discrimination. (Id. ¶ 281.) Her complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 281.) On January 27, 2006, the PHRC issued Plaintiff a right-to-sue letter with respect to her administrative claims under the Pennsylvania Human Relations Act. (Id. ¶ 282.) On March 6, 2006, the Department of Justice issued Plaintiff a right-to-sue letter with respect to her claims under Title VII of the Civil Rights Act. (Id. ¶ 283.)

On June 2, 2006, Plaintiff filed this lawsuit claiming that she has been the victim of

salary discrimination dating back to 1978. She claims Defendants violated Title VII of the

Federal Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq*., as amended ("Title VII"); Title IX of the

Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq*. ("Title IX"); the Federal Equal Pay

Act, 29 U.S.C. §§ 206, *et seq*. ("EPA"); 42 U.S.C. § 1983 ("§ 1983"); 42 U.S.C. §1985

("§1985"); § 5.1 subsection (b) of the Pennsylvania Human Relations Act, 43 P.S. §§ 951*, et seq.*

("PHRA"); the Pennsylvania Equal Pay Law ("PEPL"), 43 P.S. §§ 336.1, *et seq;* and the Equal

Rights Amendment to the Pennsylvania Constitution, Article 1, § 28 ("PERA"). (Doc. No. 1, at

1.)

On December 5, 2006, the Court stayed the litigation of this matter pending resolution of

Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007). On November 2, 2007,

Defendants filed a motion for bifurcation of discovery and dispositive motion proceedings to

address the statute of limitations issues raised by the Ledbetter decision prior to litigation on the

merits. Defendants' motion was granted on December 10, 2007.

On June 11, 2008, Defendants filed a motion for partial summary judgment arguing that

Plaintiff's claims should be dismissed as untimely based on the applicable statutes of limitations

and principles of claim accrual. Defendants ask the Court to dismiss Plaintiff's Title VII claims

based on salary and employment decisions made and communicated prior to February 26, 2004;

PHRA claims based on salary and employment decisions made and communicated prior to June

25, 2004; Title IX, §1983, §1985, PERA, EPA, and PEPL claims based on salary and

employment decisions made and communicated prior to June 2, 2004. (Id. ¶ 7.)

On January 29, 2009, the Lilly Ledbetter Fair Pay Act ("FPA" or "Act") was enacted to

supplant the Supreme Court's ruling in Ledbetter. See Lilly Ledbetter Fair Pay Act of 2009, Pub.

L. No. 111-2, § 2(1)-(2), 123 Stat 5 (2009); <u>Mikula v. Allegheny County of Pa.</u>, 583 F.3d 181,

184 (3d Cir. 2009) ("[The Fair Pay Act's] purpose was to reinstate the law regarding the

timeliness of pay compensation claims as it was prior to the Ledbetter decision."). On February

6, 2009, the Court granted the parties leave to file additional briefs regarding the effect of the

Fair Pay Act on Defendants' partial summary judgment motion. Briefing on all issues has now

been completed and the motion is ripe for disposition.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate "if

the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c). A factual dispute is material if it might affect the outcome of the

suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that

would allow a reasonable fact finder to return a verdict for the non-moving party. <u>Anderson v.

Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether

the evidence presents a sufficient disagreement to require submission to the jury or whether it is

so one-sided that one party must prevail as a matter of law. <u>Id.</u> at 251-52. In making this

determination, the Court must "consider all evidence in the light most favorable to the party

opposing the motion."  <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an

absence of a genuine issue of material fact. <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d

135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of

evidence to support the non-moving party's claims, "the non-moving party must rebut the

motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.    DISCUSSION

In this motion for partial summary judgment, Defendants seek a determination that the statutes of limitations attached to the laws at issue foreclose Plaintiff's recovery for events occurring prior to 2003 or 2004 despite the fact some of the discrimination she alleges dates back to the 1970s. Plaintiff contends that the respective statutes of limitations do not prelude any of her claims because the Fair Pay Act, the discovery rule, equitable tolling, and the continuing violation theory apply to bring all alleged acts of discrimination within the limitations period. Because the statutes at issue have distinct limitations periods and triggering criteria, the Court will address each statute in turn.

### A.    Title VII

Title VII aims to prevent employers from discriminating against employees on the basis of sex, as well as race, color, religion, and national origin. 42 U.S.C. § 2000e-2 *et seq*. To further this goal, Congress created a remedial scheme by which an aggrieved party must file a complaint with the state anti-discrimination agency, and then with the EEOC, within 300 days of the allegedly discriminatory action. 42 U.S.C. §§ 2000e-5(b) through 5(e); West v. Philadelphia Elec. Co., 45 F.3d 744, 754 n.8 (3d Cir. 1995) ("The 300-day period applies where the plaintiff has initially instituted proceedings with a State or local agency. Otherwise, the applicable period is 180 days."); Serendiski v. Clifton Precision Prods. Co., 776 F.2d 56, 63 (3d Cir. 1985). Only once the administrative proceedings have been undertaken may an individual file suit in federal court. West, 45 F.3d at 754 ("[An administrative] filing is a prerequisite to a civil suit under Title VII."). It is undisputed that Plaintiff filed her gender discrimination claim with the PHRC and EEOC on December 22, 2004. Accordingly, application of the 300-day statute of limitations period yields a rule allowing Plaintiff to recover for any discriminatory actions occurring on or after February 26, 2004. The question before the Court, then, is what discriminatory actions occurred or accrued after that date.

When this motion for summary judgment was initially filed, the Supreme Court's holdings in Ledbetter v. Goodyear Tire & Rubber Co. and Bazemore v. Friday were the authoritative law on determining how the statute of limitations applied to a pay discrimination claim. Ledbetter, 550 U.S. 618 (2007); Bazemore, 478 U.S. 385 (1986). In Ledbetter, a female employee alleged that she had received negative employment evaluations and received lower compensation because of her sex. She contended that, although the decisions to discriminate against her with regard to her compensation occurred outside the statute of limitations, receipt of

each paycheck began a new statute of limitations because it renewed the discriminatory pay decisions made earlier in her employment. The Supreme Court denied Ledbetter's claim, ruling that a pay discrimination claim accrues at the time a discriminatory pay-setting decision is initially made, not each time a discriminatory paycheck resulting from that decision is received. Ledbetter, 550 U.S. at 628-29. The Ledbetter majority distinguished the ruling from a prior case, Bazemore, which held that when a facially discriminatory pay structure is imposed, each paycheck issued pursuant to that pay structure is actionable even if the initial discriminatory pay-setting decision occurred prior to the statute of limitations. Bazemore, 478 U.S. at 395.

Since the filing of this case, Congress enacted the Lilly Ledbetter Fair Pay Act ("FPA"), which statutorily overturned the Supreme Court's ruling in Ledbetter and clarified how pay discrimination claims should be analyzed for purposes of applying the statute of limitations. Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, §§ 2(1)-(2), 3 123 Stat. 5 (2009) (codified at 42 U.S.C. § 2000e-5(e)(3)(A)). ("Congress finds the following: (1) The Supreme Court in Ledbetter significantly impairs statutory protections against discrimination in compensation that Congress established and that have been bedrock principles of American law for decades." (Internal citation omitted)). The FPA amended the definition of Title VII to state that each paycheck paid pursuant to a discriminatory pay structure is an independent, actionable employment practice whether or not the discriminatory pay decision occurred within the limitations period. Id. Specifically, the FPA provides that "an unlawful employment practice occurs . . . each time wages, benefits, or other compensation is paid," and also allows "recovery of back pay for up to two years preceding the filing of the charge . . . ." Id.

Applying the FPA to Plaintiff's claims, each paycheck received within the statute of

limitations period is actionable without Plaintiff needing to demonstrate that a discriminatory

decision to pay her less occurred within that time. Although Plaintiff couches her claim at times

as a hostile work environment claim, which would trigger application of the continuing violation

theory, the FPA precludes such an interpretation of pay discrimination claims. The words of the

FPA unequivocally dictate that each discriminatory paycheck is a discrete act of discrimination

rather than one part of an overarching practice of discrimination, thus the continuing violation

theory[1] does not apply to Plaintiff's pay discrimination claims. See Nat'l R.R. Passenger Corp. v.

Morgan, 536 U.S. 101, 112-14 (2002) (holding that the continuing violation theory does not

apply to discrete, independently actionable events even if they are related to or are part of a

pattern or practice of discrimination).

Therefore, if Plaintiff demonstrates that her wages were the result of a discriminatory

decision to pay her less money than her male co-workers, she may recover for each and every

paycheck received during the 300-day limitations period. She need not show that a

discriminatory pay-setting decision occurred within this period, as Ledbetter had required.

### 1.    Application of the Discovery Rule and Equitable Tolling

Plaintiff next argues that she can recover for paychecks received prior to the limitations

period because she was unaware of the discrimination until the final Haignere report results were

released on June 23, 2004. She alternatively argues that Defendants concealed necessary data,

actively misleading her into forgoing suit, and thus the doctrine of equitable tolling applies to

---

[1]The continuing violation theory permits "a plaintiff to pursue a Title VII claim for
discriminatory conduct that began prior to the filing period if [s]he can demonstrate that the act
is part of an ongoing practice or pattern of discrimination of the defendant." Rush v. Scott
Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997) (internal citations omitted).

allow her to recover for claims occurring outside the limitations period. By contrast, Defendants urge the Court to find that neither doctrine applies to this case because Plaintiff had sufficient information to put her on notice of her legal claims since December of 2000 or earlier.

### i.    Discovery Rule

The purpose of the discovery rule is "to postpone the beginning of the statutory limitations period from the date when the alleged unlawful employment practice occurred, to the date when the plaintiff actually discovered he or she had been injured." Oshiver v. Fishbin, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1993) (discussing the doctrines of the discovery rule and equitable tolling in the context of Title VII sex discrimination claim). The discovery rule provides that the statute of limitations for filing the initial complaint in a pay claim does not begin to run until the plaintiff knew or should have known about the alleged discriminatory act. Miller v. Beneficial Mgmt. Corp., 977 F.2d 384 (3d Cir. 1992) (overruling district court's grant of summary judgment because questions of material fact existed as to whether plaintiff could have known about a pay disparity before learning similarly situated male employee's salary); Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1420 (3d Cir. 1991) (foregoing announcement of a "bright line guide to the limitations problem" and holding that knowledge of an unfavorable performance evaluation does not start the statute of limitations clock because such knowledge, alone, is insufficient knowledge of an adverse employment action). "The discovery rule keys on a plaintiff's cognizance, or imputed cognizance, of actual injury," not the date she knew the injury was legally cognizable. Oshiver, 38 F.3d at 1390; Podobnik v. United States Postal Serv., 409 F.3d 584, 590 (3d Cir. 2005) ("[T]he discovery rule is concerned with knowledge of actual injury, not legal injury.").

In this case, Plaintiff alleges discrimination in pay. Unlike many discrimination claims, where the adverse employment action is manifestly an injury, *e.g.*, termination, demotion, or failure to promote, receipt of a paycheck is not, in itself, an injury. See generally, Ledbetter, 550 U.S. at 649 (contrasting overt injuries such as promotions, transfers, hiring and firings with the hidden injury of compensation disparity) (Ginsburg, J., dissenting). Rather, as the unfavorable employment evaluation in Colgan was not termed an injury until it resulted in termination, the receipt of a paycheck does not become an injury until the employee knows that the amount in the paycheck is artificially low due to discrimination. Colgan, 935 F.2d at 1418 (finding that it was the moment of termination, rather than notice of an unfavorable performance evaluation which led to the termination, that triggered the statute of limitations period because "an alleged unlawful employment practice . . . must have inflicted harm which was or should have been noticed, or it will not have triggered the limitations period."). Thus, while the FPA ensures that receipt of each paycheck constitutes an independent act of discrimination under Title VII, an employee does not know of her injury until she knows that the amount of the check is lower than it would be if she were male. The important question for accrual purposes, then, is when did Plaintiff know, or when should she have known through the exercise of reasonable diligence, that she was underpaid because she is a woman.

The Court finds that a reasonable fact finder must conclude that Plaintiff was on notice of her claims of pay discrimination by July 11, 2001, at the latest. In 2000, Plaintiff and the WFG identified salary equity for women as an important concern. Also in 2000, Plaintiff prepared a "Report on gender differences in faculty salaries in the College of Medicine" for the HRT, in which she recommended strategies to correct gender discrimination in salaries. (Doc.

No. 43 ¶ 170.) In addition to having read and accessed salary information to compile this report, Plaintiff admits that she was aware of at least two Faculty Senate surveys indicating a gender-based salary differential at COM, unexplainable by differences in years in rank, by June of 2001.

Moreover, in January of 2001, Plaintiff demonstrated her belief that gender discrimination was the cause of her inferior pay when she questioned the results of the 2000 AAO study because it found that gender was not a factor in COM salary determinations. By March of 2001, Plaintiff had seen a chart indicating that twenty of twenty-two COM female faculty members' salaries, including her own, were below the mean salary level for professors of their rank. On July 10, 2001, Plaintiff participated in HRT's request to Grigsby that an external salary study by commissioned to analyze salary inequities. A day later, on July 11, 2001, Plaintiff and WFG members sent a letter to Dean Kirch requesting that an independent consultant be hired to conduct a regression analysis of COM salaries because, despite ten years of studies indicating a gender bias, "the problem of gender equality has not been addressed satisfactorily." (Doc. No. 42 ¶ 223.) This July 2001 statement indicates more than an unsupported suspicion of gender discrimination; it indicates that Plaintiff had sufficient information from past salary studies and her own experiences to lead her to believe that gender discrimination was an issue in her salary determination. While the studies commissioned prior to the Haignere report may not have provided indisputable statistical evidence in support of her claim, the law does not require, and in many cases the statute of limitations period does not allow for,[2] concrete proof before filing a claim. Based on the foregoing undisputed facts, a

_____

[2]The Court notes that the statute of limitations periods at issue in this case range from 180 days to two years, while the Haignere study took two and a half years to complete from the time of Dr. Haignere's commission in January 2002 to the publication of her final report in June

reasonable fact finder could only conclude that Plaintiff was on notice of the existence of pay

discrimination by July 11, 2001. This date does not fall within 300 of Plaintiff's filing with the

EEOC, thus the discovery rule does not aid Plaintiff in recovering for paychecks received before

February 26, 2004, unless the Court also finds that equitable tolling applies to extend the statute

of limitations period for the three intervening years.                    **ii.**      **Equitable**

                                                                                        **Tolling**

      Equitable tolling "steps in to stop" the statute of limitations clock once accrual has

occurred when the plaintiff does not have sufficient knowledge of the facts supporting her cause

of action due to one of three limited circumstances: "(1) where the defendant has actively misled

the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some

extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff

has timely asserted his or her rights mistakenly in the wrong forum." Colgan, 935 F.2d at 1386,

1390; Meyer v. Riegel Prods. Corp., 720 F.2d 303 (3d Cir. 1983). For the defendant to have

actively misled the plaintiff respecting her cause of action, "the employer's own acts or

omissions [must] have lulled the plaintiff into foregoing prompt attempts to vindicate his rights,"

but need not be "egregious acts of active deception." Miller, 977 F.3d at 845 (3d Cir. 1992)

(citing Meyer, 720 F.2d at 307). Equitable tolling is to be used rarely and only in cases where a

plaintiff can show both that "(1) the defendant actively misled the plaintiff . . . and (2) this

deception caused the plaintiff's non-compliance with the limitations provision." Ruehl v.

Viacom, Inc., 500 F.3d 375, 384 (3d Cir. 2007) (quoting Oshiver v. Levin, Fishbein, Sedran &

Berman, 38 F.3d 1380, 1387 (3d Cir. 1994)). The plaintiff has the burden of establishing that the

2004.

equitable tolling doctrine applies. <u>Prodobnik</u>, 409 F.3d at 591. Equitable tolling is not an excuse for ignorance. The doctrine can only be applied upon a plaintiff's showing that "she could not, by the exercise of reasonable diligence, have discovered the essential information bearing on her claim." <u>Ruehl</u>, 500 F.3d at 384 (quoting <u>In Re Mushroom Transp. Co.</u>, 382 F.3d 325, 339 (3d Cir. 2004)).

The only alleged actions on the part of the University that might prompt equitable tolling after the July 11, 2001 accrual date are the administrators' statements that a longevity correction would be made.[3] The misinformation in the AAO study is insufficient to satisfy the requirements of equitable tolling both because all evidence indicates Plaintiff was not misled by the results of the AAO study and because there is no evidence that Defendants purposefully used improper data. Moreover, failing to advise Plaintiff that the preliminary results of an OHR study indicated the likelihood of gender bias also does not qualify as "actively misleading" Plaintiff about her cause of action or lulling her into foregoing vindication of her rights. By contrast, a reasonable fact finder could conclude that a false promise to make a longevity correction would encourage Plaintiff to forego filing a lawsuit.

At the presentation of Dr. Haignere's final results on June 23, 2004, Dean Kirch allegedly proposed a longevity correction to remedy the salary disparity revealed by Dr. Haignere's study. (Case No. 07-718, Doc. No. 37-3 at 3-9, 51.) By September 2004 at the latest,

_____

[3]The Court notes that Plaintiff supports this argument with citations to depositions on record in another case before the Court, <u>Schengrund v. Pennsylvania State Univ.</u>, No. 07-718. The two cases allege common claims, share similar issues, and challenge the same Defendants. Because Defendants do not challenge the admission of this evidence on the basis that it has not been filed as part of the record in this case, the Court assumes the parties have agreed to incorporate these documents into the record.

however, it was clarified that a longevity correction would not be made. (Id.) Plaintiff had no way to determine the administrators' plans to take corrective action other than to rely on the statements of administrators. Thus, this misleading statement as to the nature of the remedy the University would provide was not a legal misrepresentation as to the validity of a prospective suit, but rather, was a factual misrepresentation suggesting that Plaintiff need not file suit because the University would provide the entire remedy she could hope to achieve through suit.

Thus, viewing the evidence in the light most favorable to Plaintiff, a fact finder could reasonably conclude that the administration made purposeful misrepresentations about the nature and expansiveness of their proposed remedy from June 23, 2004, to September 2004, and that, but for these representations, Plaintiff would have filed suit immediately upon conclusion of the Haignere report. This alleged deception consisted of three months' delay, at the most. Accordingly, the Court will extend the period for which Plaintiff can recover on her Title VII claim by three months–from February 26, 2004, back to November 26, 2003.

**B.     Pennsylvania Human Relations Act**

Claims brought under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. §§ 951 *et seq*., are limited to those alleged acts of discrimination occurring within 180 days of the filing of Plaintiff's complaint with the Pennsylvania Human Relations Commission ("PHRC"). The parties agree that Plaintiff filed her PHRA claim on December 22, 2004, thus the statute of limitations facially allows her to recover for claims occurring on or after June 25, 2004.

The PHRA "is to be treated as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."

Fogleman v. Mercy Hosp. Inc., 283 F.3d 561, 567 (3d Cir. 2002). Employer liability under the

PHRA was treated consistently with liability under Title VII prior to the Supreme Court's

holding in Ledbetter and to the enactment of the FPA. See Knabe v. Boury Corp., 114 F.3d 407,

410 (3d Cir. 1997) ("Employer liability under the Pennsylvania Human Relations Act follows

the standards set out for employer liability under Title VII."). Defendants argue, however, that

the change in Title VII's statutory language brought about by the FPA implies that the PHRA

should be treated as Title VII was prior to the enactment of the FPA–consistent with the

Supreme Court's holding in Ledbetter. While the language of Title VII has changed by virtue of

the FPA, the Court declines Defendant's invitation.

As a preliminary matter, the holding in Ledbetter has been overruled by the FPA. Given

that the Ledbetter rule no longer even applies to Title VII cases, the Court sees no compelling

reason to expand an already defunct rule. Moreover, Congress's specific reason for changing the

language in Title VII was to restore what it felt was the authentic interpretation of pay

discrimination claims under Title VII—that each paycheck received pursuant to a discriminatory

pay decision is a separate, independently actionable act of discrimination. While the statutory

language may have changed, the meaning of Title VII both before and after the change in

language is synonymous. Thus the Court finds that the PHRA should still be interpreted

consistently with Title VII despite Title VII's change in language.

To further emphasize this point, the Third Circuit has stated that receipt of each paycheck

was considered a discrete, independently actionable incident of discrimination under Title VII

prior to Ledbetter and is again now after the promulgation of the FPA. In Mikula v. Allegheny

County, the court explained that the Supreme Court's holding in Morgan and its own holding in

O'Connor required that each discriminatory paycheck be considered "a separate discriminatory act that could give rise to a Title VII action." Mikula, 583 F.3d 181, 185 & n.2 (3d Cir. 2009). It also stated that "Morgan foreclosed the use of the continuing violation doctrine to incorporate untimely claims for discrete discriminatory actions even though they may be related to a timely claim." Id. at 185-86. Thus, each paycheck received was an independently actionable pay discrimination claim under Title VII prior to both Ledbetter and the FPA; the continuing violation theory did not apply to paycheck discrimination claims prior to Ledbetter, and it does not now. For these reasons, the Court concludes that each paycheck issued pursuant to a discriminatory pay scheme is independently actionable under the PHRA, and the continuing violation theory does not bring any paychecks received outside the limitations period within the ambit of Plaintiff's PHRA claims. Because the Court found in Part A(1)(ii) that equitable tolling may be applied from June 2004 to September 2004, which time period occurred during the two-year PHRA limitations period, the Court will extend the maximum recovery period three months, or until March 25, 2004.

### C.     Title IX, § 1983, and § 1985 Claims

The parties agree that Plaintiff's claims brought under Title IX, § 1983, and § 1985 all borrow Pennsylvania's two-year statute of limitations for personal injury claims. See Bougher v. University of Pittsburgh, 882 F.2d 74, 77-78 (3d Cir. 1989) ("[W]e conclude that the most analogous statute of limitations [for Title IX claims], as in section 1983 and 1985 claims, . . . is Pennsylvania's two year statute of limitations period applicable to personal injury actions."). The parties dispute whether the FPA, continuing violation theory, and Ledbetter apply to claims under Title IX, § 1983, and § 1985.

To begin, the parties' arguments in this section are implicitly founded on the notion that Title IX, § 1983, and § 1985 all borrow from Title VII case law on this issue; the parties simply disagree on how to interpret Title VII case law in light of recent changes.[4] As stated in the preceding section, however, the Third Circuit recently clarified that, prior to Ledbetter, Title VII case law held that each paycheck received by an employee is an independently actionable discrimination claim. See Mikula, 583 F.3d at 185 & n.2 (3d Cir. 2009) ("Morgan . . . specifically consider[ed] equal pay violations by reaffirming the statement that the Court made in Bazemore v. Friday, 478 U.S. 385 (1986) that each discriminatory paycheck was a separate discriminatory act that could give rise to a Title VII action."). Borrowing from Title VII, then, the Court finds that each paycheck received by Plaintiff that reflects a discriminatory employment decision constitutes a new, independent, adverse employment action under Title IX, § 1983, and § 1985.[5] Furthermore, the doctrine of equitable tolling may be applied to bring three

---

[4]Plaintiff, though brief in her arguments, explicitly relies on cases expressing this viewpoint. See LeGoff v. Trustees of Boston University, 23 F. Supp. 2d 120, 127 (D. Mass. 1998) ("In interpreting Title IX, courts apply the legal principles elaborated under Title VII."). Defendants do so more explicitly in contending that the reasoning in Ledbetter and O'Connor applies to these claims. (Doc. No. 42 at 25-26.) While the Third Circuit has expressly stated that the analysis of whether a claim is a discrete act or continuing violation is the same under Title VII, § 1983, and § 1985, see O'Connor v. City of Newark, 440 F.3d 125, 128-29 (3d Cir. 2006) ("We find persuasive the reasoning of our sister circuits that the distinction between "continuing violations" and "discrete acts" is not an artifact of Title VII, but is rather a generic feature of federal employment law."), it has not explicitly done so with Title IX, though other courts have. See, e.g., Murray v. New York University College of Dentistry, 57 F.3d 243 (2d Cir. 1995) ("In reviewing claims of discrimination brought under Title IX by employees, whether for sexual harassment or retaliation, courts have generally adopted the same legal standards that are applied to such claims under Title VII."). Because it is uncontested, the Court assumes Title IX necessarily borrows from Title VII for pay discrimination claims.

[5]The parties do not address Plaintiff's First Amendment claims for protected speech as time-barred. Accordingly, the Court will not specifically address them here, noting only that the same statute of limitations would apply because First Amendment claims are based upon discrete

more months' paychecks into the two-year statute of limitations period. Therefore, Plaintiff may recover on her Title IX, § 1983, and § 1985 claims for paychecks received on or after March 2, 2004.

### D. Pennsylvania Equal Rights Amendment Claims

The Pennsylvania Constitution has an Equal Rights Amendment ("PERA") that prohibits discrimination on the basis of sex. Pa. Const. Art. I, § 28. Although both parties agree that the statute of limitations for PERA is two years from the date the lawsuit was filed, the parties again dispute whether the continuing violation theory applies to bring all Plaintiff's claims within the statute of limitations, whether the FPA applies, and whether there must have been a discriminatory employment decision made during the limitations period for any of Plaintiff's claims to be actionable. In support of their respective arguments, the parties rely on the same reasoning and cases used in the preceding section. Neither party provides case law to support its position that either the holding in Ledbetter, the FPA, or the continuing violation theory applies to the PERA. Accordingly, the Court applies the same reasoning it used in Part C and finds that Plaintiff may recover under the PERA for discriminatory paychecks received on or after March 2, 2004.

### E. Federal Equal Pay Act Claims

The Equal Pay Act ("EPA") prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex . . . for equal work . . . ." 29 U.S.C. § 206(d). Violations of the EPA are subject to a two-year statute of limitations, unless the

_____

acts, as well. See O'Connor, 440 F.3d at 127-28.

violation is shown to be willful, in which case the statute of limitations is extended to three years. 29 U.S.C. § 255; Miller, 977 F.2d at 842. In this case, Plaintiff filed suit on June 2, 2006, thus the statute of limitations reaches as far back as June 2, 2003, if Plaintiff can prove a willful violation of the act, or June 2, 2004, if she cannot. The question before the Court on Plaintiff's EPA claims, as with the other claims, is whether the continuing violation theory applies to her allegations of pay discrimination.

Although in Miller the Third Circuit Court of Appeals specifically held that the continuing violation theory applies to EPA claims, the Court cannot agree that it applies to this claim because more recent precedent proscribes the application of the continuing violation theory to pay discrimination claims. See Miller, 977 F.2d at 843 ("Sex-based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act."). As stated in Part B, *supra*, the Third Circuit recently stated that the Supreme Court's holding in Morgan and its own holding in O'Connor require that each discriminatory paycheck be considered a "separate discriminatory act that could give rise to a Title VII action." Mikula, 583 F.3d at 185 & n.2. Though Mikula, O'Connor, and Morgan refer to Title VII claims in their findings that the continuing violation theory does not apply to paycheck discrimination cases or independently actionable claims, such findings apply equally to EPA claims. The Third Circuit has stated that "the application of the continuing violations doctrine is not dependent on which statute gives rise to the plaintiff's claim." Cardenas v. Massey, 269 F.3d 251 (3d Cir. 2001) (applying Miller's continuing violation theory to Title VII claims prior to the Supreme Court's holding in Morgan); see also O'Connor, 440 F.3d at 128 ("[T]he distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment

law."). Because the <u>Miller</u> holding, which applied the continuing violation theory to EPA claims, preceded <u>Mikula</u>, <u>O'Connor</u>, and <u>Morgan</u>, and runs afoul of those more recent precedents, the more recent opinions prevail. Thus the Court is constrained by more recent precedent to hold that the continuing violation theory no longer applies to paycheck discrimination claims brought pursuant to the EPA.

Though the continuing violation theory does not apply in this context, the three-month equitable tolling period, from June to September 2004, does apply to the EPA and occurs within the limitations period. Accordingly, equitable tolling impacts the recovery period, and Plaintiff may recover for paychecks received on or after March 2, 2003, if Defendants' conduct is shown to be willful, or on or after March 2, 2004, if not.

### E.      Pennsylvania Equal Pay Law Claims

The Pennsylvania Equal Pay Law ("PEPL") prohibits wage discrimination on the basis of gender. 43 P.S. § 336.1 et seq. The statute states that "any employer who willfully and knowingly violates this act, shall be liable to the employee or employees affected in the amount of their unpaid wages and in addition, an equal amount as liquidated damages." 43 P.S. § 336.5(a). A plaintiff must bring an action pursuant to this law "two years from the date upon which the violation complained of occurs." 43 P.S. § 336.5(b). Plaintiff's initial brief in opposition to summary judgment does not address Defendants' contentions regarding the PEPL, therefore she is deemed not to dispute Defendants' contention that, under the PEPL, a claim accrues each time a paycheck is issued. Because the two-year statute of limitations again reaches back to the point equitable tolling may be applicable, the Court adds an additional three months onto the maximum period for which Plaintiff may recover on this claim. Plaintiff may recover on

her PEPL claims for paychecks received on or after March 2, 2004.

## IV.    CONCLUSION

The Court finds that Plaintiff is barred from recovery under Title VII for any paychecks received prior to November 26, 2004; under the PHRA for paychecks received prior to June 25, 2004; under Title IX, Section 1983, Section 1985, and PERA, for any paychecks received prior to June 2, 2004; under the EPA for any paychecks received prior to March 2, 2003; and under the PEPL for any paychecks received prior to March 2, 2004.

An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOAN Y. SUMMY-LONG,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:06-cv-1117** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **PENNSYLVANIA STATE** | : | |
| **UNIVERSITY et al.,** | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, on this 24th day of March 2010, for the reasons set forth in the memorandum accompanying this order, **IT IS HEREBY ORDERED THAT** Defendants' motion for partial summary judgment (Doc. No. 41) is **GRANTED** in part and **DENIED** in part as follows:

1. Plaintiff may recover for discriminatory paychecks or actions that accrued on or after November 26, 2003, in her Title VII claim;

2. Plaintiff may recover for discriminatory paychecks or actions that accrued on March 25, 2004, in her PHRA claim;

3. Plaintiff may recover for discriminatory paychecks or actions that accrued on or after March 2, 2004, in her Title IX, Section 1983, Section 1985, and PERA claims;

4. Plaintiff may recover for discriminatory paychecks or actions that accrued on March 2, 2003, in her EPA claim; and

5. Plaintiff may recover for discriminatory paychecks or actions that accrued on March 2, 2004, in her PEPL claim.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District Pennsylvania