## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOAN Y. SUMMY-LONG, | : | No. 1:06-cv-01117 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY, <u>et al.</u>, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

## December 27, 2016

Today, litigation over ten years in the making comes to a close. On June 2, 2006, Joan Y. Summy-Long, Ph.D., sued The Pennsylvania State University and various other players for allegedly discriminating against her on the basis of sex and then retaliating against her when she attempted to redress her concerns. Her federal complaint was, by all accounts, the culmination of several years spent by Plaintiff zealously advocating for the equitable treatment of women faculty at the University's College of Medicine in Hershey, Pennsylvania. However, despite this case's chronicled past and the momentous resources expended on sundry procedural motions, the dearth of affirmative evidence in the record suggesting a

discriminatory or retaliatory animus on the part of the Defendants requires, as the British poet T.S. Eliot once foreshadowed, that the conflict end "not with a bang but with a whimper."[1]

Given the tangled history of this case, it must be recognized that a superficial review of the preliminary allegations and the statistics that accompany them tend to invite hasty assumptions in the minds of newcomers unfamiliar with the action's vast procedural underbelly. Such a cursory examination disserves this case. Instead, when one considers the practical backdrop of this litigation, the stark reality is this: if a viable claim ever truly existed, Plaintiff has likely fumbled it away with her less than artful pleadings, her penchant for firing lawyers, and her persistent engagement in dilatory practices.

Consistent with the analysis below, no genuine dispute of material fact exists as to Plaintiff's claims of discriminatory or retaliatory treatment. As such, Defendants' motion for summary judgment will be granted in full.

## **BACKGROUND**

The facts of this case are well known to the Court and the parties. They have previously been set forth at length numerous times, most notably in a partial summary judgment memorandum opinion by the Honorable Yvette Kane of this

---

[1]   T.S. Eliot, "The Hollow Men" (1925).

Court, to whom the matter was assigned until 2013.[2] Nevertheless, this litigation

now concluding, I will recount the pertinent facts for a final time.

Plaintiff was the first ever graduate student employed by the College of

Medicine's Pharmacology Department, a role she began in 1969.[3] Just under ten

years later, in 1978, she received her Ph.D. in pharmacology from that very same

department.[4] In her prime, Plaintiff found her second home there, having once

reminisced that she "grew up and flourished as a scientist and educator in the

Department of Pharmacology."[5] Plaintiff was promoted to Associate Professor in

1983 and granted tenure in 1984.[6] She later attained the rank of Full Professor in

1992.[7]

The College of Medicine pays its faculty under a merit-based system, a

system that rewarded scholarly output and the attainment of prestigious national

grants with discretionary salary increases. As the parties acknowledge, starting

---

[2]   See ECF No. 92, as revised by ECF No. 100.

[3]   ECF No. 249 at 2 ¶ 1; 88 ¶ 340.

[4]   Id. at 2 ¶ 2.

[5]   Id. at 89 ¶ 343.

[6]   Id. at 3 ¶ 4.

[7]   Id. at ¶ 5.

salaries are a function of a combination of factors, including the faculty member's rank at hire, experience, and specific expertise.[8] Likewise, faculty salaries are affected by market factors, such as the demand for and prestige of a particular discipline.[9] In addition to automatic annualized increases applied to one's base salary, a professor could also be awarded a merits-based salary increase depending upon her publication history and grant outcomes during the prior year.[10]

These merit-based incentives were determined by the faculty member's department chair.[11] The department chair would allot merits increases from a limited pool of funds, and by definition, faculty members received distinct merits increases, if any, depending on their annual achievements.[12] The amount of a faculty member's annual merit increase was therefore generally a function his or her level of performance.[13] Furthermore, faculty members received an 8% base

---

[8]   ECF No. 249 at 11 ¶ 45.

[9]   Id. at 12 ¶ 46.

[10]   Id. at 12 ¶¶ 48–52.

[11]   Id. at 13 ¶ 53.

[12]   Id. at 13 ¶¶ 54–55. See also Vrana Dep. at 41-42, ECF No. 231-6; Zolko Dep. at 64, ECF No. 231-8; Base Salary History for Summy-Long and Colleagues, ECF No. 228, Exhibit 101.

[13]   Id. at 14 ¶ 56. See also Zolko Aff. p15, ECF No. 44-2, p. 16; Grigsby Dep. at 99-102, ECF No. 231-7.

salary increase on promotion from Assistant Professor to Associate Professor and promotion from Associate Professor to Professor.[14]

Plaintiff, along with another female faculty member at the College of Medicine, formed the Women's Faculty Group in 1999 to advocate for issues affecting women faculty.[15] Shortly after its formation, the Women's Faculty Group identified salary equity for women faculty as an important concern.[16] In August 2000, the Women's Faculty Group discussed the disparate salary compensation issue at a meeting with then College of Medicine Dean Darrell Kirch and again with Vice Dean for Faculty and Administrative Affairs Kevin Grigsby in October of that year.[17]

Shortly thereafter, the University's Affirmative Action Office conducted an analysis of faculty salaries within the College of Medicine's basic science departments.[18] The study, released on July 21, 2000, concluded that "sex is not a significant factor in explaining salary in this population and there is no indication

---

[14]   Id. at 12 ¶ 48.

[15]   ECF No. 92 at 4.

[16]   Id.

[17]   Id.

[18]   Id.

of systemic bias on the basis of sex."[19] Several members of the Women's Faculty

Group did not accept the accuracy of this study and in a January 2001

memorandum addressed to Grigsby, the Women's Faculty Group questioned the

integrity of the results.[20]

Acknowledging an inconsistency in the way in which certain salary data was

gathered or reported, the University agreed to conduct a subsequent salary study

for the College of Medicine and to retain an outside expert to do so.[21] The

University retained Dr. Lois Haignere, President of Haignere, Inc., to conduct the

study.[22] Dr. Haignere's study was confined to the 2001–2002 academic year and

did not render any individualized conclusions.[23] However, in her 2004 report, Dr.

Haignere concluded that there existed a difference, though not a statistically

significant one, between the salaries paid to male and female faculty members as a

class.[24] As a consequence of the findings of the Haignere Report, all tenured and

---

[19]  Id.

[20]  Id.

[21]  Id. at 5.

[22]  Id. at 6.

[23]  Id. See also ECF No. 249 at 69 ¶¶ 257–58.

[24]  ECF No. 92 at 6. See also ECF No. 249 at 71 ¶ 268; May 28, 2015 Becker
      Report, pp. 8-9, ECF No. 231-39.

tenure-track white female basic scientists, including Plaintiff, received a 3.8%

salary increase effective July 1, 2004.[25]

For the next few years, Plaintiff underperformed her male counterparts

academically. In particular, despite having devoted 80% of her time to research

activities, Plaintiff's superiors would grow dissatisfied with her scholarly output.

For instance, in her annual evaluation following the 2006–2007 academic year, Dr.

Kent Vrana, then the Chair of the Pharmacology Department, indicated that he

expected to see "growth" in Plaintiff's "[r]esearch efforts" during the next

evaluation period.[26] The assessment noted that without Plaintiff obtaining

additional grants or an extension of her existing grant, "funds will soon be

exhausted to support [her] laboratory's research."[27] Dr. Vrana "urged" Plaintiff to

"increase publications" and "seek extramural funding to support [her] research

efforts and that portion of [her] salary that is requested by the institution."[28]

In that same review, Dr. Vrana memorialized the following exchange: He

decided to offer Plaintiff the opportunity to chair a committee after she complained

---

[25]  ECF No. 249 at 73 ¶ 274.

[26]  ECF No. 231 Ex. 11 at 9.

[27]  ECF No. 231 Ex. 11 at 9.

[28]  Id.

about the lack of such opportunities during her evaluation discussion, but she rejected him, stating "I don't feel I should have to ask, and I now am not interested in chairing a committee."[29] The evaluation concluded that it was "vitally important" for Plaintiff to make application for the renewal of her existing grant or to "explore other opportunities that might be funded in the near-term."[30]

Of particular emphasis was Plaintiff's failure to timely apply for renewal of her 2003 National Institute of Health (NIH) grant. Grant awards are important to the College of Medicine because they help defray personnel costs.[31] In fact, NIH grants are the most significant form of funding a biomedical researcher can receive.[32] Thus, although NIH funding may wax and wane, sustained grants of that type are considered the hallmark of a successful career for a biomedical researcher.[33] Grant funding is so critical to the efficient operation of medical schools like the College of Medicine that it established a 25% external salary

---

[29] Id.

[30] Id.

[31] ECF No. 249 at 23 ¶ 80.

[32] ECF No. 249 at 23 ¶ 81.

[33] ECF No. 249 at 24 ¶ 85.

support benchmark, requiring that its faculty members fund a minimum of 25% of their salary with the proceeds of external research grants.[34]

As the College of Medicine's 2003 Academic Compensation Plan (referred to by the parties as the "ACP") explained, "It is important that faculty strive to obtain additional grant-derived salary dollars, which are necessary for the department to fulfill its obligations for support of faculty salaries and additional expenses to maintain the department."[35] It should be noted that the 25% requirement was set below the College of Medicine's ideal goal of 50% salary support through external grant funding for each faculty member.[36] Should a faculty member's external support fall below the 25% threshold level, that individual would begin a probationary period one and a half to two years in length, after

---

[34] ECF No. 228 Ex. 7 at 7 ("The second component of the salary structure represents the supplement and consists of 25% of total compensated effort. For most faculty members on the Scientist-Educator academic pathway, funds for the supplemental component of the salary will be derived from the individual investigator's research grants. This will require that the faculty member support a minimum of 25% of his/her effort with extramural funding to cover the supplement.").

[35] ECF No. 228 Ex. 7 at 7.

[36] Id. ("It is the expectation of the College of Medicine that faculty members who have been employed by the College of Medicine for three or more years support a minimum of 50% of their assigned research effort from extramural sources.").

which time, her salary would be reduced by 8.3% (the value of one month's pay in

a twelve-month contract) if her funding was not satisfactorily restored.[37]

The NIH grant at issue in Plaintiff's case was awarded in 2003 and permitted

her to fund 50% of her salary for the 2003-2004, 2004-2005, and 2005-2006

academic years.[38] As Dr. Vrana explained during his deposition, grant recipients

typically attempt to apply for renewal approximately nine months before the

expiration of the funded period.[39] By all accounts, however, Plaintiff's dilatoriness

in regard to her renewal application cost her the opportunity secure this particular

NIH funding for an additional period. Dr. Vrana testified that "in three successive

years, we [Dr. Vrana and Plaintiff] talked about resubmitting that grant."[40] Dr

Vrana went on to explain that the Plaintiff "failed to do it at the normal deadline

and then committed to do it the following year, missed that deadline, [and] missed

the next deadline."[41] All told, during her time as a member of Dr. Vrana's

---

[37] Id.

[38] ECF No. 249 at 48 ¶¶ 177–78.

[39] Vrana Dep., ECF No. 231 Ex. 6 at 34:09–12.

[40] Id. at 34:13–14.

[41] Id. at 34:13–17.

department, "the bottom line was that she [Plaintiff] never resubmitted that grant for funding."[42]

Further, the parties agree that the primary duty of a basic scientist like Plaintiff here is "to perform biomedical research and publish the results of the research."[43] Thus, in quite cyclical fashion, a research scientist's publications were inextricably linked with her ability to court external funding and therefore enable further experimentation, further publication, and so forth. However, between 2004 and 2007, the time period during which she was asked to bolster her scholarly contributions, Plaintiff published only one article.[44] Comparatively, Dr. Vrana noted that although there is "no hard and fast rule," faculty similarly situated to Plaintiff would be expected to publish, on average, ten to fifteen articles during any given three-year span.[45] Vrana published nineteen articles during that exact time period.[46]

---

[42]  Id. at 34:17–18.

[43]  ECF No. 249 at 32 ¶ 114.

[44]  ECF No. 249 at 49 ¶ 183.

[45]  ECF No. 231 Ex. 6 at 58:07–20.

[46]  Id. at 58:09–12.

Dr. Vrana made explicit that this lack of funding and lack of scholarly output accounted for Plaintiff's poor evaluations relative to males in the department:

> Q.    You've explained in pretty good detail how you evaluated Dr. Summy-Long. Were there male colleagues of hers who also weren't getting things published at that time?
>
> A.    Were not getting things published? No, there were none.
>
> Q.    There none?
>
> A.    That were not getting things published.
>
> Q.    What about the grants, getting grants renewed, did you have to have any conversations like this like you described you had with her with any male colleagues in the department?
>
> A.    No. They all had funding at that time. Towards the end, Dr. Levenson may have—he lost his funding but got it right back. So I didn't have to have that conversation because he submitted lots of grants.[47]

Taking into consideration these factors, Dr. Vrana set all of the salaries in the Pharmacology Department, subject to administrative approval.[48] As he explained, Plaintiff's "history of funding . . . was consistent with her being the lowest [paid]. And if you look at the number of grant dollars brought in up to that point or at that point, she was the lowest. She hadn't published much in the preceding couple of

---

[47]  Id. at 56:04–19.

[48]  Id. at 21:18–20.

years."[49] As such, Plaintiff's salary was reduced effective July 1, 2009 under the terms of the Academic Compensation Plan.[50] The reduction came after the Plaintiff left the Pharmacology Department and joined the Neural and Behavioral Sciences Department as a consequence of what she perceived to be a lack of support from Dr. Vrana and his administrative staff.[51]

Plaintiff filed her federal civil rights complaint with this Court on June 2, 2006, before any other member of the Women's Faculty Group had done so. On April 23, 2007, the remaining female faculty at the College of Medicine who claimed that their salaries were tainted by sex discrimination filed a separate federal action together in this district captioned as <u>Schengrund, et al. v. The</u>

---

[49]  <u>Id.</u> at 26:19–25. In terms of her absolute rather than relative pay, it should be noted for the record that Plaintiff did, however, receive three base salary increases of 7.9%, 2%, and 8% in years 2004, 2005, and 2006, respectively. <u>Id.</u> at 48:18–19; 29:23–30:02. The purpose of these increases, as Dr. Vrana explained, was to align as practicably as possible Plaintiff's base salary with the Association of American Medical College's 50th percentile—a national standard that the Defendants aspired to meet for each faculty member. <u>Id.</u> at 19:16–22.

[50]  ECF No. 249 at 55 ¶ 207. <u>See also</u> July 29, 2009 Barnstable Memo to Plaintiff, ECF. No. 231-33; Zolko Dep. pp. 91-92, ECF No. 231-8; Base Salary History for Summy-Long and Colleagues, ECF No. 228, Exhibit 101.

[51]  <u>See</u> ECF No. 249 at 51 ¶ 189; 89 ¶¶ 341–44.

<u>Pennsylvania State University, et al.</u>[52] For certain earlier key procedural decisions that determined the applicable recovery periods, the <u>Schengrund</u> case, like this case, was assigned to Judge Kane. At no time did the Plaintiff ever move for class certification, and the remaining women never sought to consolidate their case with hers.

An interrogatory response reveals that the other members of the Women's Faculty Group may have waited for the results an additional administrative proposal before filing their action, thought the record is disappointingly quiet as to Plaintiff's separation from her one-time allies.[53] Moreover, the record in the <u>Schengrund</u> matter reveals that one of the plaintiffs in that case made the following observation about the Plaintiff here during her deposition:

> Q.   Did there come a time when you were aware that the Women's Faculty Group was requesting that a salary study be done by an external person?
>
> A.   Yes.
>
> Q.   Did you know that there was some push to get that done?

---

[52]   4:07-cv-00718.

[53]   <u>See</u> ECF No. 44 Ex. 7 at 34 "The GROUP, prior to this, had been unsuccessful in engaging the University in mediation to resolve "past discrimination and salary inequities" via complaint filed with the Affirmative Action Office (AAO) in January 2005. I was a member of the GROUP until filing their claim with the EEOC, when my inclusion was viewed as redundant."

A.     I think by—Joan Summy-Long said that to me or in some
       discussion had mentioned that. . . . I couldn't really say because
       I don't know when Joan could have told me. But when that
       would be and whether I really paid attention because she was
       always talking about issues and problems and things. And like I
       said, I would just go and do my work after that discussion. Like
       a lot of times she was upset so it was more to me, you know,
       consoling her sort of.[54]

Interestingly, it can also be discerned from the record that on February 3,

2009, Plaintiff moved this Court to consolidate her case with the <u>Schengrund</u>

matter.[55] In the certificate of non-concurrence required under our Local Rules,

counsel for the Defendants in the present matter contested consolidation, while

counsel for the plaintiffs in <u>Schengrund</u> represented that he "has not yet formulated

his position and will advise the court and counsel in due course."[56] That position

was never revealed, however, as Judge Kane denied Plaintiff's motion to

consolidate <u>sua sponte</u> on February 27, 2009, as a consequence of Plaintiff's

failing to submit an appropriate supporting brief also in accordance with our Local

Rules.[57]

---

[54]   Mulder Dep. at 24–26; 4:07-cv-00718, ECF No. 32 Ex. 4 at 83–85.

[55]   ECF No. 84.

[56]   <u>Id.</u> Ex. 3.

[57]   ECF No. 86.

Early in 2010, after Judge Kane had issued her memorandum opinion on the applicable recovery periods in both cases, the <u>Schengrund</u> plaintiffs opted for mediation and dismissed their action pursuant to a settlement agreement shortly thereafter.[58]  Thus, although Plaintiff's complaint had initially been captioned as a putative class action, when all of the remaining aggrieved female faculty settled their claims, it became inevitable that Plaintiff was proceeding on an individualized basis.

On March 24, 2010, Judge Kane issued a memorandum opinion disposing of Defendants' partial summary judgment motion and assessing the effects of the Lilly Ledbetter Fair Pay Act of 2009 on Plaintiff's claim.[59]  "In [that] motion for partial summary judgment, Defendants [sought] a determination that the statutes of limitations attached to the laws at issue foreclose Plaintiff's recovery for events occurring prior to 2003 or 2004 despite the fact [that] some of the discrimination she alleges dates back to the 1970s."[60]  In her March 2010 summary judgment memorandum and in a subsequent November 2010 motion for reconsideration

---

[58]  4:07-cv-00718, ECF No. 90.

[59]  ECF No. 92 at 9 (citing Pub. L. 111-2, 123 Stat. 5).

[60]  <u>Id.</u> at 10.

memorandum, Judge Kane agreed and issued the following order, explicitly

limiting the applicable recovery periods as follows:

1.   Plaintiff may recover for discriminatory paychecks or actions that accrued **on or after February 26, 2004**, in her Title VII claim;

2.   Plaintiff may recover for discriminatory paychecks or actions that accrued **on or after June 25, 2004**, in her PHRA claim;

3.   Plaintiff may recover for discriminatory paychecks or actions that accrued **on or after June 2, 2004**, in her Title IX, Section 1983, Section 1985, and PERA claims;

4.   Plaintiff may recover for discriminatory paychecks or actions that accrued **on or after June 2, 2003**, in her EPA claim; and

5.   Plaintiff may recover for discriminatory paychecks or actions that accrued **on or after June 2, 2004**, in her PEPL claim.[61]

Unfortunately**,** as this Court has recounted in prior memoranda and orders,

since the matter was reassigned from Judge Kane to me on January 17, 2013, I

began to face, ad nauseam, a recurring stream of requests on Plaintiff's part to both

change counsel and to enlarge the time allotted for discovery.[62] All told, Plaintiff

contracted with six different attorneys throughout the course of her case. As I

---

[61]   ECF. No. 100.

[62]   ECF Nos. 239–40.

observed, Plaintiff's proclivity to exhaust counsel had become "a not altogether surprising" facet of this litigation.[63]

With six new lawyers also came Plaintiff's continued efforts to extend the discovery period. This Court had previously extended the discovery deadline five times for Plaintiff: ECF No. 164 (first, extending discovery through January 10, 2014); ECF No. 166 (second, extending discovery through April 23, 2014); ECF No. 168 (third, extending discovery through July 22, 2014); ECF No. 175 (fourth, extending discovery through June 3, 2015); and ECF No. 203 (fifth and finally, extending discovery through August 7, 2015). In fact, even before it had granted the final extension, this Court had already remarked in a prior order that it "[could] envision no conceivable exception to this clearly articulated deadline" and that "no further extensions of time to complete this rather fundamental litigation task would be permitted."[64]

Still, on the final day of the fact discovery deadline, Plaintiff again came to this Court seeking to compel Defendants to comply with a stale 2014 discovery request.[65] Plaintiff filed the initial request, which she then sought to compel, on

---

[63]  ECF No. 178 at 1.

[64]  Id. at 2–3.

[65]  ECF No. 206.

January 3, 2014.[66] However, the Defendants had previously advised Plaintiff of their objections to producing the documents on January 13, 2014 and again on March 13, 2014.[67] In my view, the motion to compel would have forced Defendants to produce a host of documents that would effectively enlarge the temporal scope of this already-prolonged litigation by twenty-four years.[68] Because that request was overly broad and unduly burdensome and because granting further discovery extensions to Plaintiff would strain the bounds of reasonableness and fairness to all litigants, this Court denied Plaintiff's motion.[69] In response, Plaintiff filed a motion to certify this Court's order for interlocutory appeal.[70] Because Plaintiff failed to show that interlocutory appeal was warranted, her motion was denied.[71]

---

[66]   ECF No. 207 at 1.

[67]   ECF No. 211 at 19–20.

[68]   Id.

[69]   ECF Nos. 220–21.

[70]   ECF No. 222.

[71]   ECF Nos. 239–40.

The Defendants filed their motion for summary judgment on December 18, 2015.[72] After requests to supplement the record by both parties were granted, the motion ripened on April 28, 2016.[73] In accordance with the following reasoning, Defendants' motion for summary judgment will be granted in full.

## LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[74] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[75]"Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[76]

---

[72]   ECF No. 230.

[73]   ECF Nos. 253, 259, & 262.

[74]   Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

[75]   Fed. R. Civ. P. 56(a).

[76]   Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) and Celotex Corp., 477 U.S. at 322).

"A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[77] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[78]

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[79] Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[80] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[81] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly

---

[77] Clark v. Modern Grp. Ltd., 9 F.3d at 326.

[78] Id.

[79] Liberty Lobby, Inc., 477 U.S. at 252.

[80] Id.

[81] Id.

proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[82]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[83] "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[84]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[85] For movants and nonmovants alike, the

---

[82]  Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson, 81 U.S. 442, 447 (1871)).

[83]  Celotex Corp., 477 U.S. at 323 (internal quotations omitted).

[84]  Id.

[85]  Liberty Lobby, Inc., 477 U.S. at 250.

assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[86]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[87] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[88] On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."[89]

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether

---

[86]   Fed. R. Civ. P. 56(c)(1).

[87]   Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[88]   Fed. R. Civ. P. 56(e)(2).

[89]   Fed. R. Civ. P. 56(c)(3).

there is a genuine issue for trial."[90] "[T]here is no issue for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party."[91] "If the evidence is merely colorable . . . or is not significantly

probative, summary judgment may be granted."[92]

As the United States Court of Appeals for the Third Circuit has explicitly

instructed district courts who are disposing of a summary judgment motion in the

employment discrimination setting:

> [T]o defeat summary judgment when the defendant answers the
> plaintiff's prima facie case with legitimate, non-discriminatory
> reasons for its action, the plaintiff must point to some evidence, direct
> or circumstantial, from which a factfinder could reasonably either
> (1) disbelieve the employer's articulated legitimate reasons; or
> (2) believe that an invidious discriminatory reason was more likely
> than not a motivating or determinative cause of the employer's action.
> In other words, . . . a plaintiff who has made out a prima facie case
> may defeat a motion for summary judgment by either (i) discrediting
> the proffered reasons, either circumstantially or directly, or
> (ii) adducing evidence, whether circumstantial or direct, that
> discrimination was more likely than not a motivating or determinative
> cause of the adverse employment action.
>
> [T]o avoid summary judgment, the plaintiff's evidence rebutting the
> employer's proffered legitimate reasons must allow a factfinder
> reasonably to infer that each of the employer's proffered non-
> discriminatory reasons was either a post hoc fabrication or otherwise

---

[90]  Liberty Lobby, Inc., 477 U.S. at 249.

[91]  Id.

[92]  Id. at 249–50 (internal citations omitted).

did not actually motivate the employment action (that is, the proffered reason is a pretext).

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons. While this standard places a difficult burden on the plaintiff, it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs.[93]

## ANALYSIS

## I.     There Is No Genuine Dispute Of Material Fact With Respect To Plaintiff's Sex Discrimination Claims.

For the reasons that follow, I conclude that there is no genuine dispute of material fact as to whether the Defendants discriminated against Plaintiff on the basis of sex. Accordingly, Defendants' motion for summary judgment is granted as to the following counts: Count I (Title VII Discrimination); Count II (Title IX Discrimination); Count III (Pennsylvania Human Relations Act Discrimination); and Count IV (Federal Equal Pay Act Discrimination/Pennsylvania Equal Pay Act

---

[93] <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764–65 (3d Cir. 1994) (Becker, C.J.) (internal citations and quotations omitted) (emphasis in original).

Discrimination; Pennsylvania Equal Rights Amendment Discrimination; and

Discrimination  pursuant to 42 U.S.C. §§ 1983, 1985).

> **A.    Plaintiff styled this action as a disparate treatment claim and is precluded from tacking on novel theories of liability in her summary judgment brief.**

Plaintiff asks the Court to construe her sex discrimination claims as asserting

a disparate impact theory of liability, despite a long and settled history to the

contrary. That the Court must still endeavor at this stage of the litigation to discern

the exact causes of action upon which Plaintiff seeks to proceed speaks volumes

both to this case's convoluted history and to the circuitous manner in which

Plaintiff has prosecuted it. Still, because the substance of Plaintiff's papers in

opposition to summary judgment equivocate as to the applicable theory of liability,

such an inquiry is unfortunately required.

It is black letter law that the  plaintiff is the master of her complaint.[94] She

may "decide what law [s]he will rely upon," "may pursue or omit any available

cause of action [s]he chooses," and may select "specific theories of recovery."[95] As

---

[94]  Morgan v. Gay, 471 F.3d 469, 477 (3d Cir. 2006) (Smith, J.).

[95]  Easterling v. Gulf Guar. Ins. Co., 60 F. Supp. 2d 586, 588 (S.D. Miss. 1999) (quoting Willy v. Coastal Corp., 855 F.2d 1160, 1167 (5th Cir.1988); Clark v. Edgar, No. CIV A 06-CV-1067, 2007 WL 2566277, at *3 (M.D. Pa. Aug. 31, 2007). Huff v. Nationwide Ins. Co., 167 B.R. 53, 58 (W.D. Pa. 1992), aff'd, 989 F.2d 487 (3d Cir. 1993).

such, "a plaintiff may not defeat summary judgment by asserting a claim that [s]he did not plead in the complaint."[96] Rather, "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)."[97] "To permit a plaintiff to do otherwise would subject defendants to unfair surprise," as "the Federal Rules of Civil Procedure still require that the complaint give the defendant fair notice of the claim and its supporting facts."[98]

By extension, several courts have held that the plaintiff in an employment discrimination case cannot avoid summary judgment on a given theory of liability—disparate treatment or disparate impact, for instance—having withheld a countervailing theory only to slyly reveal it in a summary judgment brief. A leading decision by the United States Court of Appeals for the Third Circuit is Josey v. John R. Hollingsworth Corp.[99] The plaintiff in Josey brought a Title VII disparate treatment claim, alleging that he had been discharged and mistreated in

---

[96] Spengler v. Worthington Cylinders, 514 F. Supp. 2d 1011, 1017 (S.D. Ohio 2007) (Tucker v. Union of Needletrades, Indus., and Textile Employees, 407 F.3d 784, 787-88 (6th Cir.2005)).

[97] Tucker, 407 F.3d at 788 (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp.2005)).

[98] Tucker, 407 F.3d at 788.

[99] 996 F.2d 632, 641 (3d Cir. 1993).

the workplace because of his race.[100] After discovery closed, the plaintiff raised a

disparate impact theory for the first time in his summary judgment papers.[101] Even

though the disparate impact claim was based upon a similar set of facts, the district

court rejected it outright, reasoning that "[t]hese new allegations were never pled

and would obviously prejudice [the defendant] because it would face completely

different burdens and defenses."[102] The district court termed that tactic

"incredibl[e]" and concluded that it was "improper to allow plaintiff to proceed

with these new allegations in opposing summary judgment."[103]

The Third Circuit affirmed the district court's preclusion of the eleventh-

hour disparate impact allegations, expressing similar concerns over potential

prejudice to the defendant, expansion of the applicable burdens and defenses, and

any resultant delay in the matter's disposition.[104] Further, the court explained that

wholesale addition of a novel claim at the summary judgment stage was highly

---

[100] Id. at 635–37.

[101] Id. at 641–42. See also Josey v. John R. Hollingsworth Corp., No. CIV. A. 91-4606, 1992 WL 78838, at *3 (E.D. Pa. Apr. 9, 1992) ("Plaintiff also attempts to defeat summary judgment under a theory of disparate impact.").

[102] 1992 WL 78838, at *3.

[103] Id.

[104] 996 F.2d at 641–42.

improper given Federal Rule of Civil Procedure 15(a)'s liberal standard for amended pleadings.[105] The Third Circuit concluded that the disparate impact allegations were appropriately disregarded—to hold otherwise would impermissibly "weaken the district court's control over its own docket."[106]

The Third Circuit again confronted a plaintiff who failed to timely plead a disparate impact theory in Spence v. City of Philadelphia.[107] In nearly identical procedural posture to that in Josey, the Spence court affirmed a district court's grant of summary judgment in favor of a defendant against whom a disparate impact theory was not raised until after the close of discovery.[108] Like the plaintiff in Josey, the plaintiff in Spence did not raise a disparate impact theory in his Equal Employment Opportunity Commission (EEOC) charge or his federal complaint; rather, he raised it for the first time in his summary judgment papers.[109]

---

[105] Id. at 642.

[106] Id.

[107] 147 F. App'x 289 (3d Cir. 2005).

[108] Id. at 291–92.

[109] Id. at 291.

The Third Circuit in <u>Spence</u> appealed to the fundamental notion that a claim not timely raised is waived.[110] To consider a belated claim would "impermissibly prejudice[ ]" a defendant forced to defend against "a new theory of liability" with effectively "no notice" of the claim's particulars.[111] The Third Circuit also cited for support the decision by the United States Court of Appeals for the Ninth Circuit in <u>Coleman v. Quaker Oats Co.</u> That case stands for the explicit proposition that "where a plaintiff sets forth only the disparate treatment theory in his pleadings and does not move to amend his complaint until summary judgment following the close of discovery, the plaintiff is barred from proceeding on the disparate impact theory."[112]

<u>Josey</u>, <u>Spence</u>, and <u>Coleman</u> require that Plaintiff's untimely references to disparate impact discrimination be disregarded. To permit a last-ditch alteration in her case theory would alter the playing field in such a way as to impede presentation of an adequate defense.[113] The critical question from the beginning

---

[110] <u>Id.</u>

[111] <u>Id.</u> at 292.

[112] 232 F.3d 1271, 1292 (9th Cir. 2000).

[113] <u>See, e.g.</u>, <u>Ste. Marie v. E. R. Ass'n</u>, 650 F.2d 395, 399 (2d Cir. 1981) (Friendly, J.) ("We reject this belated attempt to introduce a new theory of liability. . . . To

has always been, as Defendants succinctly state, "whether Plaintiff Joan Summy-Long's salary at Penn State's College of Medicine was the result of sex discrimination."[114] Plaintiff's own complaint confirms this. Her leading paragraph in the "Nature of Action" section confines her complaint to "unlawful discriminatory practices by Defendants in the employment of the Plaintiff and other women with respect to compensation, terms, conditions and privileges of employment, because of their sex (female)."[115] Again, in the "General Allegations" section, Plaintiff suggests that the complained-of discrimination "manifest[ed] itself in gender and/or gender-age inequities in salary compensation and all benefits, including calculation of pension and retirement payments that are based upon salary compensation."[116]

These averments, even if they contemplated proceeding on a classwide basis when written, nevertheless suggest that Plaintiff wished only to rely upon a disparate treatment theory that contested discrete salary determinations and not on a disparate impact theory, the latter of which would require identification of a

---

hold the defendants to the more stringent burden applicable in a disparate impact case at this date would be <u>manifestly unfair</u>.") (emphasis added).

[114] ECF No. 257 at 5.

[115] ECF No. 1 at 2 ¶ 1.

[116] <u>Id.</u> at 7 ¶ 21.

particular policy or practice that negatively affected women. Even the averments under the "Count I" (Title VII) heading limit Plaintiff to a disparate treatment theory. The only substantive paragraph containing factual allegations about the supposed discrimination is Paragraph 34, which reads as follows: "The gender and/or gender-age discrimination consisted, in part, of the denial of appropriate adjustments and different treatment with regard to standing, benefits, salary, bonuses, position, and other benefits of employment than similarly-situated males."[117] Consequently, no averment is devoted to any particular policy or practice that had a disparate impact on female wage-earners. To the contrary, the sole focus is on discrete, individualized employment decisions.

It is tempting to make the following counter-argument: the Court was deciding a case about alleged sex discrimination before and even if it permits Plaintiff's late disparate impact theory, it will be deciding a sex discrimination case afterward. That is, however, too high a level of generality from which to view this prolonged, complex matter. In addition, it neglects the existence of distinct legal burdens and defenses applicable to each of these divergent theories of discrimination.

---

[117] ECF No. 1 at 10.

Further, by not grieving a disparate impact theory in her Pennsylvania Human Rights (PHRA) complaint, plaintiff has failed to exhaust the required administrative remedies. "Plaintiffs pursuing discrimination claims must file a discrimination charge with the required agencies, including the EEOC, prior to filing in federal court."[118] As the United States Court of Appeals for the Second Circuit has explained, "[e]xhaustion is ordinarily 'an essential element' of a Title VII claim."[119] The purpose of the grievance process's notice provision "is to encourage settlement of discrimination disputes through conciliation and voluntary compliance," which "would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC."[120] Thus, unless claims omitted from an EEOC charge or a state-comparable complaint are "reasonably related" to those enumerated ones, the omitted claims cannot be brought in federal court.[121] The "central question" is whether the administrative complaint provided that agency "adequate notice to investigate discrimination on both bases."[122]

---

[118] <u>Tourtellotte v. Eli Lilly & Co.</u>, 636 F. App'x 831, 850–51 (3d Cir. 2016).

[119] <u>Williams v. N.Y. City Hous. Auth.</u>, 458 F.3d 67, 70 (2d Cir. 2006).

[120] <u>Miller v. Int'l Tel. & Tel. Corp.</u>, 755 F.2d 20, 26 (2d Cir. 1985).

[121] <u>Williams</u>, 458 F.3d at 70.

[122] <u>Id.</u>

In particular, the Second Circuit has ruled that "complaints of individualized disparate treatment are not reasonably related to a Title VII disparate impact claim alleging class-wide discrimination."[123] By extension, in <u>Cavallaro v. Corning, Inc.,</u> the United States District Court for the Western District of New York applied Second Circuit precedent to exclude a disparate impact claim where only a disparate treatment theory had been properly grieved. The court wrote:

> Plaintiff contends that the EEOC would naturally have investigated the application of Corning's rules to all employees. This is simply too far a stretch. To adopt plaintiff's position would allow virtually every disparate treatment claim to encompass a disparate impact claim as well. Plaintiff's disability discrimination claim based upon a theory of disparate impact must therefore be dismissed on the additional ground that it exceeds the scope of his administrative charge.[124]

Plaintiff's Pennsylvania Human Relations Commission complaint, which she cross-filed with the Equal Employment Opportunity Commission, was brought solely on behalf of herself and omitted reference to any other female co-workers who earned a lower salary than male faculty members.[125] Like the averments contained in Plaintiff's federal complaint, the substantive allegations in the administrative charge focus only upon discrete employment actions, such as the

---

[123] <u>Burgis v. N.Y. City Dep't of Sanitation</u>, 798 F.3d 63, 71 (2d Cir. 2015), <u>cert. denied,</u> 136 S. Ct. 1202, 194 L. Ed. 2d 183 (2016).

[124] 93 F. Supp. 2d 334, 341 (W.D.N.Y. 2000).

[125] ECF No. 44 Ex. 7 at 12.

provision of less favorable "compensation, terms, conditions and privileges of employment."[126] Plaintiff also alleged that gender discrimination manifested itself in the "calculation of pension and retirement payments that are based upon salary compensation."[127] The nature of these averments, all of which complain of discrete employment actions, conforms only to a disparate treatment theory of discrimination. A critical piece of any successful disparate impact complaint is missing: Plaintiff identified no policy or practice that resulted in the generalized discrimination she contests.

Moreover, the procedural history of this action has expressly limited its scope to a disparate treatment theory. Plaintiff's own statement of the case in the joint case management plan, a document used by the Court to fashion the bounds of discovery, states that "Plaintiff alleges that Defendants engaged in discriminatory practices based on gender, manifesting itself in different treatment with regard to standing, benefits, salary, bonuses, position, and other benefits of employment than similarly-situated males."[128] Like those previously discussed,

---

[126] Id. at ¶ 3.

[127] Id.

[128] ECF No. 8 at 3.

that statement hews closely to a disparate treatment theory and omits discussion of

the core characteristics of a disparate impact theory in their entirety.

The comprehensive list of factual issues in dispute from that same document

confirms this focus on a disparate treatment theory to the exclusion of a disparate

impact theory. The list reads:

(a)     Whether Defendants engaged in gender or gender-age discrimination.

(b)     Whether Defendants denied appropriate adjustments and engaged in different treatment of females and Plaintiff in particular with regard to standing, benefits, salary, bonuses, position, and other benefits of employment than similarly situated males.

(c)     Whether Defendants engaged in illegal discrimination against faculty members, including Plaintiff, by paying female faculty members, including Plaintiff, less than male faculty members for work requiring equal skill, effort, and responsibility on the basis of sex.

(d)     Whether Defendants discriminated against Plaintiff and/or retaliated against Plaintiff as a result of her activities directed toward reduction and/or elimination of gender bias and discrimination.[129]

Again, in my view, this list conforms closely to the hallmark elements of a

disparate treatment theory and quite plainly lacks the necessary features of a viable

---

[129] Id. at 3–4.

disparate impact claim. Specifically, the parties do not dispute the existence of a policy or practice responsible for a generalized salary disparity based on sex.

Perhaps most strikingly is the fact that the Defendants have previously brought this precise procedural flaw to Plaintiff's attention. On October 23, 2008 in a filing that contested the timeliness of Plaintiff's claims, Janine C. Gismondi, Esquire, counsel for the Defendants, pointed out that "not only has Plaintiff failed to exhaust her administrative remedies for any disparate impact claim, she has not pled a disparate impact claim in her Complaint."[130] "Nothing in Plaintiff's Complaint or, indeed, in her Brief," Ms. Gismondi continued, "identifies a specific employment practice that allegedly caused a disparate impact to Plaintiff. As such, she has not asserted a disparate impact claim."[131]

I agree that the quoted language, perhaps appearing prophetic to outsiders though eerily omniscient to those well-versed with this action, rings just as true now as when it was first uttered. More importantly, however, it establishes that the Plaintiff was on notice as early as 2008 that there existed severe procedural deficiencies in her filings. The appropriate time to amend the operative theory in

---

[130] ECF No. 73 at 12.

[131] Id. at 12–13.

her complaint and to cure that flaw would have been then, not eight years later,

buried in the argument section of a summary judgment brief.

### B. A disparate impact theory would nevertheless fail as a matter of law because Plaintiff has not identified the specific employment practice that she is challenging.

Even were the Court to reach her purported disparate impact theory, I would

be forced to reject it as a matter of law, the Plaintiff having failed to adequately

identify any policy or practice responsible for the suggested compensation

discrepancies. When a plaintiff fails to identify the precise mechanism by which an

employer is alleged to have discriminated against a given class, the essential

underpinnings of disparate impact claim have not been proffered, and such a claim

must therefore fail as a matter of law.

The Supreme Court of the United States has explained that identification of

a statistical disparity between members of a protected class and employees not

belonging to that class is insufficient to support a disparate impact claim. Neither

does a generalized policy of mistreatment suffice. Rather, the plaintiff must reach

beyond facial discrepancies and pinpoint the exact discriminatory vehicle. In Smith

v. City of Jackson, Mississippi, the Court explained as much in the context of age

discrimination:

> Turning to the case before us, we initially note that petitioners have
> done little more than point out that the pay plan at issue is relatively

less generous to older workers than to younger workers. They have not identified any specific test, requirement, or practice within the pay plan that has an adverse impact on older workers. As we held in Wards Cove, it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities. Petitioners have failed to do so. Their failure to identify the specific practice being challenged is the sort of omission that could result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances.[132]

Further, in Wal-Mart Stores, Inc. v. Dukes, the Supreme Court clarified that generalized accusations of bias are insufficient to satisfy this aspect of a disparate impact claim, particularly in cases involving a large institutional defendant wherein discretion is delegated and exercised at several junctures throughout the organizational structure. Though the Court reached this conclusion through the lens of Federal Rule of Civil Procedure 23's "commonality" requirement for class actions, the underlying substantive law claim for which the class members sought certification was that of sex discrimination based upon a disparate impact theory:

To be sure, we have recognized that, in appropriate cases, giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since an employer's undisciplined system of subjective decisionmaking can have precisely the same effects as a system pervaded by impermissible intentional discrimination. But the recognition that this type of Title VII claim

---

[132] 544 U.S. 228, 241 (2005) (internal quotation marks and citations omitted).

"can" exist does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common.

. . .

Respondents have not identified a common mode of exercising discretion that pervades the entire company—aside from their reliance on [the] social frameworks analysis that we have rejected. In a company of Wal–Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction. Respondents attempt to make that showing by means of statistical and anecdotal evidence, but their evidence falls well short.

. . .

In the landmark case of ours [Watson v. Fort Worth Bank & Trust] which held that giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory, the plurality opinion conditioned that holding on the corollary that merely proving that the discretionary system has produced a racial or sexual disparity is not enough. The plaintiff must begin by identifying the specific employment practice that is challenged. That is all the more necessary when a class of plaintiffs is sought to be certified. Other than the bare existence of delegated discretion, respondents have identified no "specific employment practice"—much less one that ties all their 1.5 million claims together. Merely showing that Wal–Mart's policy of discretion has produced an overall sex-based disparity does not suffice.[133]

The plurality opinion in Watson v. Fort Worth Bank & Trust, the landmark case that the Wal-Mart Court cited, explicitly sought to provide "a fresh and somewhat closer examination of the constraints that operate to keep [disparate

---

[133] Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 355–57 (2011).

impact] analysis within its proper bounds."[134] To accomplish this, the plurality opinion in Watson set forth a three-layer system of restraints that it hoped would curtail overuse of the disparate impact theory of liability.

After Watson, a plaintiff "must begin by identifying the specific employment practice that is challenged."[135] Even though identification of such a practice may be "difficult" in cases involving subjective selection criteria, the Court made clear that generalized notions of bias were insufficient. It wrote that "[e]specially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."[136]

Next, "[o]nce the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a

---

[134] 487 U.S. 977 (1988).

[135] Id. at 994.

[136] Id.

protected group."[137] As to this step, the <u>Watson</u> Court explained that "statistical disparities must be sufficiently substantial that they raise such an inference of causation."[138] Thus, minor statistical correlations are insufficient and necessarily fail at this stage. Rather, courts must demand causal proof that the complained of policy results, for class members, in employment outcomes "significantly different" and "substantially disproportionate" from that of non-class members.[139]

Lastly, a court need not accept a plaintiff's statistical evidence but may conduct its own inquiry into the data's reliability as well as the true statistical measures for the given population. Similarly, "[i]f the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own."[140] Though the Court did not provide an exhaustive list of the types of flaws that would render statistical data unsuitable for federal court, it did note that small or incomplete data sets, conclusions that rested

---

[137] <u>Id.</u>

[138] <u>Id.</u> at 994–95.

[139] <u>Id.</u> at 995.

[140] <u>Id.</u> at 996.

on faulty comparisons, and methodologies that employed inadequate statistical techniques would all fail at this stage.[141]

Plaintiff's disparate impact theory suffers from at least three fatal flaws that directly track the <u>Watson</u> framework: first, she fails to identify with any specificity the particular practice or policy that might explain the male-female salary discrepancy that she alleges exists; second, she has failed to establish causation either generally or in her case in particular; and finally, the surveys upon which she relies failed to consider lurking variables other than sex that might explain the male-female salary discrepancy and did not yield statistically significant results.

**C.    Plaintiff's Title VII claim must fail because she has not established a prima facie case or shown that the Defendants' legitimate, non-discriminatory explanation of her poor academic performance is merely pretextual.**

As expanded upon more fully below, summary judgment in favor of the Defendants is appropriate as to Plaintiff's Title VII claim. The statistical evidence cited by Plaintiff fails to establish a prima facie case for a disparate treatment claim of sex discrimination. In addition, the Plaintiff has failed to show that the Defendants' legitimate, non-discriminatory explanation—that her academic performance fell well below that of her peers—is mere pretext.

---

[141] <u>See</u> <u>id.</u>

### 1. The statistical evidence cited by Plaintiff fails to establish a prima facie case for a disparate treatment claim of sex discrimination.

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of [ ] discrimination."[142] "Since the precise elements of a prima facie case often depend on the nature of the particular factual dispute at issue, a 'one-size-fits-all' approach cannot be used in this context. Instead, the elements of a prima facie case must be tailored to fit the specific context in which they are applied."[143]

In order to establish a prima facie case of pay discrimination based upon sex under Title VII, a plaintiff must show that: (1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees of the opposite sex were treated more favorably.[144] "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of

---

[142] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

[143] Prise v. Alderwoods Grp., Inc., 657 F. Supp. 2d 564, 589 (W.D. Pa. 2009) (internal citations omitted).

[144] See Johnson v. McGraw-Hill Companies, 451 F. Supp. 2d 681, 697 (W.D. Pa. 2006) (citing Goodwin v. Board of Trustees of the University of Illinois, 442 F.3d 611, 617 (7th Cir.2006); Grande v. State Farm Mutual Automobile Insurance Co., 83 F.Supp.2d 559, 562 (E.D.Pa.2000)).

their race, color, religion, sex, or national origin."[145] Thus, "in order to establish a case of unequal pay, plaintiffs must demonstrate that they were performing work substantially equal to that of [male] employees who were compensated at higher rates than they were."[146] Arguably, Plaintiff has not satisfied any of these requirements but for showing that, as a female, she belongs to a protected class under the law.

"If the plaintiff can establish a prima facie case, the employer must then give a legitimate, nondiscriminatory reason for its action in order to rebut the inference of discrimination."[147] "If the employer presents such a reason, the plaintiff can still prove discrimination by showing that the stated reason is a mere pretext for a decision motivated by discrimination."[148] However, "if a plaintiff fails to establish a prima facie case of discrimination or fails to raise a genuine factual dispute

---

[145] Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (per curiam) (internal citations and quotations omitted).

[146] Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1087 (3d Cir. 1996).

[147] Brewington v. Sunbridge Regency N. Carolina, Inc., No. 1:06CV1112, 2007 WL 4522619, at *3 (M.D.N.C. Dec. 18, 2007) (citing McDonnell Douglas, 411 U.S. at 802). See also Sarullo, 352 F.3d at 797–98 ("[T]he prima facie test remains flexible and must be tailored to fit the specific context in which it is applied.").

[148] Brewington, 2007 WL 4522619, at *3 (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)).

concerning the employer's legitimate and non-discriminatory explanation for the alleged discriminatory act, the defendant is entitled to summary judgment."[149]

Plaintiff's brief in opposition to Defendants' summary judgment motion is muddled, unfocused, and severely lacking in probative force. For starters, the Court considers it bewildering that counsel for Plaintiff devoted eighteen of the brief's twenty-four pages to revisiting prior discretionary discovery rulings that did not go his client's way. Regardless, counsel for Plaintiff has left the Court with a farrago of statistics, allegations, and deposition snippets that miss the mark altogether in a disparate treatment case.

The crux of Plaintiff's argument is that "it should be clear from . . . the history of salary studies at the Medical College that Plaintiff Summy-Long, as well as other women faculty, were discriminated against by regularly being paid salaries lower than their male comparators."[150] To the contrary, the Third Circuit has previously instructed that district courts to treat statistical evidence "with caution" in disparate treatment cases.[151] Indeed, as defense counsel points out, the Third

---

[149] <u>Brewington</u>, 2007 WL 4522619, at *3 (citing <u>Henson v. Liggett Group, Inc.</u>, 61 F.3d 270, 274 (4th Cir.1995)).

[150] ECF No. 224 at 22.

[151] <u>Healy v. N.Y. Life Ins. Co.</u>, 860 F.2d 1209, 1217 (3d Cir. 1988) (Becker, J.). "We emphasize that 'statistics are not irrefutable; they come in infinite variety,

Circuit has even "note[d] the relative unimportance of statistical evidence in an individual treatment case."[152] The United States Court of Appeals for the Seventh Circuit too has written that "we fail to see how [the plaintiff's] broad-based evidence is more than collaterally relevant to his individual claim."[153] Lower courts have followed such admonitions as well. For instance, the United States District Court for the Eastern District of Pennsylvania dismissed a disparate treatment claim that relied solely upon generalized statistics, reasoning that such pattern and practice evidence "could not sustain" the action or help it rise "above the level of [ ] speculative."[154]

The reason for such distrust of statistical evidence as the sole means of proof in a disparate treatment case was verbalized by the Supreme Court in <u>Cooper v. Federal Reserve Bank</u>:

> The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's

---

and, like any other kind of evidence they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances.'"   <u>Id.</u>   at 1217–18 (quoting <u>International Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 340 (1977)).

[152] <u>Abrams v. Lightolier Inc.</u>, 50 F.3d 1204, 1217 (3d Cir. 1995).

[153] <u>Gilty v. Vill. of Oak Park</u>, 919 F.2d 1247, 1252 (7th Cir. 1990).

[154] <u>Chandler v. Univ. of Pennsylvania</u>, 927 F. Supp. 2d 175, 183 (E.D. Pa. 2013).

claim is the reason for a particular employment decision, while at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.[155]

Arguably, the preeminent appellate decision calling into question the unbridled use of generalized statistics to support a disparate treatment claim is that of the United States Court of Appeals for the Fifth Circuit in Pouncy v. Prudential Insurance Company of America.[156] The plaintiff in Pouncy, a black employee of Prudential Insurance, alleged that the company had discriminated against black workers as a class by affording them less favorable conditions of employment relative to white workers.[157] Specifically, the plaintiff presented statistics purportedly demonstrating that the company intentionally paid its black workers less on average than white counterparts.[158]

The statistical evidence at issue in Pouncy was that of a mean salary comparison between black and white employees hired by the company from 1973 through 1978. According to the plaintiff, the evidence sustained the inference of international discrimination, because it showed that white employees had a greater

---

[155] Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 (1984).

[156] 668 F.2d 795 (5th Cir. 1982).

[157] See id. at 797.

[158] See id. at 799.

mean weekly salary than black employees.[159] To the contrary, the Fifth Circuit

affirmed the district court's bench trial judgment in favor of the defendant and

termed the plaintiff's statistics "a naked comparison of average weekly salaries

without regard to level of skill, education and training from which no meaningful

conclusion can be drawn . . . much less a prima facie case."[160]

According to the Fifth Circuit, the fatal flaw evident in the statistical

methodology in Pouncy was, like that of the Haignere Report here, a "fail[ure] to

take into account the fact that a number of factors operate simultaneously to

influence the amount of salary an employee receives."[161] Specifically, the Fifth

Circuit reasoned that the purported mean salary discrepancies "may be explained

by any number of nondiscriminatory factors."[162] For instance, it wrote that

"[d]ifferent job levels, different skill levels, previous training, and experience: all

---

[159] Id. at 802.

[160] Id. It should be noted that although the Third Circuit had once taken a stance marginally at odds with Pouncy's outright rejection of statistical shortcomings in disparate treatment actions, such a stance was vacated by the Supreme Court of the United States in accordance with its subsequent decision in Wards Cove. See USX Corp. v. Green, 490 U.S. 1103, 109 S.Ct. 3151 (1989). Regardless, the Third Circuit has not rejected Pouncy's advice for critical analysis of the overreliance on statistics in the disparate treatment context.

[161] Id. at 803.

[162] Id.

may account for unequal salaries in an environment free of discrimination."[163] To proceed otherwise would be akin to following, as the <u>Pouncy</u> court termed it, a "baseless assumption" predicated upon "inconclusive evidence."[164]

The Haignere Report, Plaintiff's lead piece of evidence, suffers from equally damning flaws. From the outset, one might observe that the Haignere Report was not prepared as an expert submission in anticipation of litigation, meant to conclusively establish the components of a Title VII claim. Instead, it was merely an institutional study prepared to analyze the existence and extent of any sex-based salary discrepancies at the College of Medicine. It did not purport to establish causation or to explain why such a discrepancy may have developed; it did not examine an expansive timeframe common in such cases; it did not identify as a matter of law any classes of comparators; and it did not control for all of those variables that would render its conclusions, as the <u>Pouncy</u> court described, legally "baseless" and "inconclusive." Strikingly, it did not even analyze the individualized circumstances of Plaintiff's employment at the College of Medicine.

---

[163] <u>Id.</u>

[164] <u>Id.</u> at 803 & n.9 ("Statistical proof insufficient to prove discrimination under a disparate impact theory is, by definition, also inadequate to show discrimination under a disparate treatment theory.").

I will now highlight several aspects of the Haignere Report that make it unsuitable to carry the prima facie burden in of a Title VII disparate treatment case. From my perspective, the single most glaring issue that prevents the Haignere Report from providing an adequate evidentiary basis here is its utter lack of causal analysis. Such a shortcoming manifests itself in two ways: first, the reason for the purported disparities is unknown and could therefore be attributable to either systemic or individualized characteristics wholly unrelated to any discriminatory motive; second and relatedly, Dr. Haignere equivocates as to the inclusion of such lurking variables as rank and tenure in her analysis, variables that could quite obviously provide a non-discriminatory explanation for her findings.

Dr. Haignere's report contains several tables of data from which she draws her statistics. From my perspective, the below totals, when read critically, call into question the existence of individualized disparate treatment, despite Dr. Haignere's apparent lack of focus as to the backstory that animates them:

**Table 1. Tenure Track Population**[165]

|  | White Male | Minority Male | White Female | Minority Female |
|---|---|---|---|---|
| **Professor** | 27 | 4 | 12 | 0 |
| **Associate Professor** | 24 | 8 | 6 | 1 |
| **Assistant Professor** | 12 | 7 | 4 | 4 |
| **Tenure Track Totals** | 63 | 19 | 22 | 5 |

According to the table above, tenure track professors include 82 males and 27 females. Given the attendant salary increases that accompany an award of tenure and ascension through the tenure track ranks,[166] it is entirely unclear why any salary disparity would not be properly attributed to the sheer magnitude of males in tenure-track positions relative to females. In fact, the parties do not dispute that faculty members receive an 8% base salary increase upon promotion from assistant professor to associate professor and again upon promotion from associate professor to professor.[167] As such, an individualized disparate treatment claim is not supported on those statistics alone, absent some indication that the

---

[165] ECF No. 228 Ex. 11 at 6 (Figure 2a).

[166] See ECF No. 249 at 12–16 ¶¶ 48, 53–57.

[167] Id. at 12 ¶ 48.

particular claimant's salary in fact was caused by a discriminatory motive.[168] The simple fact is that the numbers in the Haignere Report leave much to be desired in the way of causation.

One might next wonder, as Dr. Haignere did, "whether there are promotional barriers affecting women and minorities in the institutional processes governing rank advancement."[169] "Is this the result of self-selection or institutional barriers?" Dr. Haignere asked.[170] That these questions were asked and remain unanswered is a testament to the fact that the Plaintiff has not met her prima facie case and that perhaps an individualized claim was never the appropriate way to proceed.

Additional data points relied on by Dr. Haignere reveal that 82 out of 144 (or 56.94%) of men held tenure track positions, while 27 out of 62 (or 43.55%) of women did.[171] Perhaps calculations of those proportions and an accompanying test for significance of those differences at the 5% level would have aided claimants

---

[168] I also believe the concerns underlying this error are similar to those identified by the defense expert, Dr. Elizabeth Becker, Ph.D., of National Economic Research Associates, Inc., whereby she faults Dr. Haignere for aggressively pooling distinct faculty sub-groups in certain of her analyses. ECF No. 231 Ex. 39 at 8.

[169] ECF No. 228 Ex. 11 at 4.

[170] Id.

[171] See ECF No. 228 Ex. 11 at 6 (Figure 2a).

who pursued their case collectively, but those calculations and tests are notably absent from her report and otherwise irrelevant for our purposes now. Even then, as the United States Court of Appeals for the First Circuit once commented in a similar action, "statistics, though striking upon first reading, may simply reflect an absence of qualified female applicants, rather than pervasive sex discrimination."[172]

In addition to its lack of any causal conclusion whatsoever, the Haignere Report is also inconsistent in its inclusion (or exclusion) of certain confounding or lurking variables. Further, its explanation of lurking variables is somewhat loaded in my view. For example, it describes such variables as "likely to have discrimination embedded in them and, thus, <u>mask</u> or suppress gender effects."[173] However, a statistician taking the position contrary to Dr. Haignere might simply describe lurking variables as variables excluded from the analysis but likely to <u>predict</u> salary differences. Thus, whether these lurking variables are truly problematic after all might depend on the analyst's orientation.

To illustrate, Dr. Haignere provides the following example of a tainted or lurking variable: "[I]f height were included in a salary analysis where gender based

---

[172] <u>Lamphere v. Brown University</u>, 685 F.2d 743, 750 (1st Cir. 1982).

[173] ECF No. 228 Ex 11 at 8 (emphasis added).

disparity exists, the shortness of females relative to mails could explain much of the gender differences in salaries."[174] Although true, that is a thoughtless example: whereas height plays no role in setting one's salary at the College of Medicine, rank and tenure surely do. From there, Dr. Haignere states the variables most likely to <u>mask</u> gender disparities are those dealing with rank, tenure-track status, and research award totals. Thus, Dr. Haignere chose to exclude those variables from certain of her analyses.[175] That seemed, from the get-go, an odd caveat to me. One would think that rank, tenure-track status, and research award totals would actually be relatively strong <u>predictors</u> of one's salary earned, and as Dr. Haignere even acknowledged, their exclusion has a tendency to "overestimate disparities."[176]

That being said, what causal phenomena are at work is unfortunately beyond the scope of the Haignere Report: perhaps external funding bodies are more likely to award teams comprised of primarily male scientists with the most significant research grants; perhaps the crop of faculty during the survey year included an inordinate number of talented male faculty; or perhaps the College of Medicine

---

[174] ECF No. 228 Ex. 11 at 8.

[175] ECF No. 228 Ex. 11 at 10 ("For example, if the frequency tables indicate that tenure status could act as a suppressor variable, we conduct analyses with and without tenure status.").

[176] <u>Id.</u>

willfully set the salaries of female faculty members artificially low. We do not

know the answer as a general matter or in Plaintiff's particular case, and no matter

how many times we read it, the Haignere Report will never reveal it to us. What

that does tell us, however, is that Plaintiff has failed to put forth a prima facie case

of discrimination. What we have here, as in <u>Pouncy,</u> is "a naked comparison of

average weekly salaries without regard to level of skill, education and training

from which no meaningful conclusion can be drawn . . . much less a prima facie

case."[177]

It should also be noted that Dr. Haignere's results were not statically

significant at the standard 5% level. Although Dr. Haignere attempts to explain this

shortcoming away by contrasting between sample statistics and statistics wherein

the entire population can be studied,[178] I am not so persuaded. As Dr. Becker

explains, the 5% level is the widely accepted benchmark for significant results in

the statistical community.[179] This is because when a statistical difference is

observed at the 5% level, a statistician can be 95% confident that the observed

difference was not a product of random chance. In other words, at the 5% level,

---

[177] ECF No. 228 Ex. 11 at 8.

[178] ECF No. 228 Ex. 11 at 19–20.

[179] ECF No. 231 Ex. 39 at 9.

only one out of twenty times will the researcher's rejection of the hypothesis that there is no statistical difference in salaries be invalid.[180]

To the contrary, Dr. Haignere's probability value for the white female effect in the primary regression was 0.1559, meaning that there exists an approximately 16% chance that any claimed disparity in salaries was not the product of a faculty member's sex.[181] In other words, there is 16% chance that the variable corresponding to one's sex is unaccompanied by a non-zero coefficient in a standard regression analysis and would therefore exert no mathematical effect on salary whatsoever.[182] Moreover, Dr. Haignere's threshold claim that significance plays less of a role in instances where the entire population is known also seems to fall flat. Certainly, statistical significance would be relevant both in regression analysis and in basic testing for the existence of a difference between the mean salaries received by the two sexes. Even if the law does not explicitly require a certain level of significance, I think it quite critical in this case, which lacks any semblance of causal force, that the Plaintiff's proffered statistics are also unable to satisfy the generally accepted level of significance.

---

[180] Id.

[181] ECF No. 231 Ex. 9 at 10.

[182] See id.

Moreover, the sole salary inputs for the Report are data points from a single year, the 2001–2002 academic year, which falls outside of the statute of limitations period previously determined by Judge Kane. As has been eloquently reiterated:

> A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.[183]

Consequently, not only does the Haignere Report examine purported salary disparities for a time period preceding the applicable limitations period, but it also fails to account for the effects of the nearly 4% salary increase of which the Plaintiff was the recipient effective July 1, 2004 as a consequence of the study's findings.

In addition, the quite apparent fault that attends submission of a college-wide study in and individualized disparate treatment action is that the Plaintiff constitutes only a single data point in that broad study—a lone observation pooled among countless others whose individualized circumstances, talents, credentials, shortcomings, and other qualitative markers remain absent from view. As much as it amounts to a misuse of statistical methods, it also appears eerily fallacious:

---

[183] <u>United Air Lines, Inc. v. Evans</u>, 431 U.S. 553, 558 (1977).

1.      As a whole, female faculty of the College of Medicine are paid on

        average less than their male counterparts.

2.      Plaintiff is a female faculty member of the College of Medicine.

3.      Therefore, Plaintiff must be paid less than her male counterparts.[184]

An example illustrates this fallacy: Suppose that a given college has five male

faculty and five female faculty. Each of the male faculty members earns $5,000 per

month, but the female faculty members earn the following monthly salaries:

$6,000; $4,000; $6,000; $4,000; and $2,500. Thus, while the male faculty members

of this hypothetical institution of higher education take home $5,000 per month,

the women average $500 less per month or $4,500. That does not mean that any

female faculty member included in the survey is a victim of sex discrimination. In

fact, it does not even mean that any female faculty member included in the survey

has been the victim of an adverse decision in the form of compensation at all.

        Accordingly, although it may be true that <u>on average</u> women faculty look

statistically worse off in this example, that type of group measure paints a

---

[184] <u>See</u> "Fallacy of Division" at https://en.wikipedia.org/wiki/Fallacy_of_division:

1.      The 2nd grade in Jefferson elementary eats a lot of ice cream.

2.      Carlos is a 2nd grader in Jefferson elementary.

3.      Therefore, Carlos eats a lot of ice cream.

relatively poor picture of each individual female faculty member's particularized situation. Suffice it to observe that in the example above, two of the female faculty actually earn more than all of their male counterparts, despite the misleading sample statistic. Even more telling, we know nothing qualitative about any of these faculty: Who is the department chair? Who earned the most prestigious research grant last academic year? Who has been teaching in their department the longest? Who are the tenured professors? Who chairs a core campus committee? Who has been published most frequently in top-tier journals? And so on. Because the Haignere Report's results do not adequately address these intricacies, it is insufficient as a matter of law to establish a prima facie case of disparate treatment sex discrimination.[185]

By extension, I note that Dr. Haignere was never even identified in Plaintiff's Rule 26 disclosures, let alone ever having been declared as a potential expert at trial, despite the Defendants having identified Dr. Elizabeth Becker, Ph.D., of National Economic Research Associates, Inc., as their expert witness.[186]

---

[185] As Dr. Haignere herself admitted, "[m]ultiple regression analyses do not adequately address the individual level . . . [they] pertain to class or systemic differences." ECF No. 249 Ex. 18 at 2.

[186] See ECF No. 8 at 7 ("Disclosures"). See also Fed. R. Civ. P. 26 & Local Rule 16.3(a). Neither does it appear that Dr. Haignere was ever deposed in connection with her involvement in this case.

Regardless, given its flaws as outlined above and having not been prepared with an eye toward litigation, the Haignere Report would, in my view, be unlikely to overcome a <u>Daubert</u> challenge.[187]

In conclusion, as in <u>Pouncy</u>, the Plaintiff here presents the Court with "a naked comparison of average weekly salaries . . . from which no meaningful conclusion can be drawn." [188] Without more, she has failed to make out a prima facie case. Although the analysis could conclude there, I continue on to explain why Plaintiff has also failed to establish the sort of pretextual showing required to defeat summary judgment.

### 2. The Plaintiff has failed to show that the Defendants' legitimate, non-discriminatory explanation of substandard academic performance is mere pretext.

Were I to assume satisfaction of the prima facie case, the burden would shift to the Defendants to show that a legitimate, nondiscriminatory reason motivated the contested employment decisions. Such legitimate, nondiscriminatory explanations already accepted by Third Circuit courts in similar disputes include: "continuing performance deficiencies"; "poor performance"; "failure to meet [ ] job expectations"; and "failure to meet the requirements of [a] corrective action

---

[187] <u>See, e.g.</u>, <u>Bruno v. Bozzuto's, Inc.</u>, 311 F.R.D. 124, 141 (M.D. Pa. 2015).

[188] ECF No. 228 Ex. 11 at 8.

plan."[189] The Defendants have made such a showing here. In particular, they cite to numerous pieces of evidence in the record indicating that the Plaintiff's salary was reflective not of her sex, but of her poor academic performance relative to that of her male (and female) colleagues.

Despite having devoted 80% of her time to research activities, Plaintiff's superiors were dissatisfied with her scholarly output during the operative recovery period as calculated by Judge Kane. For instance, in her annual evaluation corresponding to the 2006–2007 academic year, Dr. Vrana, the Chair of Plaintiff's Department at the time, indicated that he expected "growth" in Plaintiff's "[r]esearch efforts" during the next evaluation period.[190] That same evaluation also noted that without Plaintiff obtaining additional grants or an extension of her existing grant, "funds will soon be exhausted to support [her] laboratory's research."[191] Dr. Vrana "urged" Plaintiff to "increase publications" and "seek extramural funding to support [her] research efforts and that portion of [her] salary

---

[189] Bielich v. Johnson & Johnson, Inc., 6 F. Supp. 3d 589, 596 (W.D. Pa. 2014). Blozis v. Mellon Trust of Delaware Nat. Ass'n, 494 F. Supp. 2d 258, 269 (D. Del. 2007). Watkins v. Nabisco Biscuit Co., 224 F. Supp. 2d 852, 859 (D.N.J. 2002).

[190] ECF No. 231 Ex. 11 at 9.

[191] ECF No. 231 Ex. 11 at 9.

that is requested by the institution."[192] In that same review, Dr. Vrana

memorialized the following exchange: He decided to offer Plaintiff the opportunity

to chair a committee after she complained about the lack of such opportunities

during her evaluation discussion, but she rejected him, stating "I don't feel I should

have to ask, and I now am not interested in chairing a committee."[193] The

evaluation concluded by stating that it was "vitally important" for Plaintiff to make

adequate application for the renewal of her grant or either to "explore other

opportunities that might be funded in the near-term."[194]

Particularly problematic was Plaintiff's failure to timely apply for renewal of

her 2003 National Institute of Health (NIH) grant. Understandably, grant awards

are important to the College of Medicine because they help defray personnel

costs.[195] NIH grants in particular are the most significant form of funding a

biomedical researcher can receive.[196] Thus, although NIH funding may wax and

wane, sustained grants of that type are considered the hallmark of a successful

---

[192] Id.

[193] Id.

[194] Id.

[195] ECF No. 249 at 23 ¶ 80.

[196] ECF No. 249 at 23 ¶ 81.

career for a biomedical researcher like Plaintiff.[197] Grant funding is so critical to

the efficient operation of medical schools like the College of Medicine that it

established a 25% external salary support benchmark, requiring that its faculty

members fund a minimum of 25% of their salary with the proceeds of external

research grants.[198] As the College of Medicine's 2003 Academic Compensation

Plan explained, "It is important that faculty strive to obtain additional grant-

derived salary dollars, which are necessary for the department to fulfill its

obligations for support of faculty salaries and additional expenses to maintain the

department."[199] It should be noted that the 25% requirement was set below the

College of Medicine's ideal goal of 50% salary support through external grant

funding for each faculty member.[200] Should a faculty member's external support

---

[197] ECF No. 249 at 24 ¶ 85.

[198] ECF No. 228 Ex. 7 at 7 ("The second component of the salary structure represents the supplement and consists of 25% of total compensated effort. For most faculty members on the Scientist-Educator academic pathway, funds for the supplemental component of the salary will be derived from the individual investigator's research grants. This will require that the faculty member support a minimum of 25% of his/her effort with extramural funding to cover the supplement.").

[199] ECF No. 228 Ex. 7 at 7.

[200] ECF No. 228 Ex. 7 at 7 ("It is the expectation of the College of Medicine that faculty members who have been employed by the College of Medicine for three

fall below the 25% threshold level, that individual would begin a probationary period one and a half to two years in length, after which time, her salary would be reduced by 8.3% (the value of one month's pay in a twelve-month contract) if her funding was not satisfactorily restored.[201]

The NIH grant at issue in Plaintiff's case was awarded in 2003 and permitted her to fund 50% of her salary for the 2003-2004, 2004-2005, and 2005-2006 academic years.[202] As Dr. Vrana explained during his deposition, grant recipients typically attempt to apply for renewal approximately nine months before the expiration of the funded period.[203] By all accounts, however, Plaintiff's dilatoriness in regard to her renewal application cost her the opportunity secure this particular NIH funding for an additional period. Dr. Vrana testified—and Plaintiff does not adequately show otherwise—that "in three successive years, we [Dr. Vrana and Plaintiff] talked about resubmitting that grant."[204] Dr. Vrana went on to explain that the Plaintiff "failed to do it at the normal deadline and then committed to do it

---

or more years support a minimum of 50% of their assigned research effort from extramural sources.").

[201] Id.

[202] ECF No. 249 at 48 ¶¶ 177–78.

[203] Vrana Dep., ECF No. 231 Ex. 6 at 34:09–12.

[204] Id. at 34:13–14.

the following year, missed that deadline, [and] missed the next deadline."[205] All told, during her time as a member of Dr. Vrana's department, "the bottom line was that she [Plaintiff] never resubmitted that grant for funding."[206]

Plaintiff offers several varying explanations as to why she failed to reapply for this particular funding, though she does not contest the existence of the underlying delay.[207] According to the record, Plaintiff has advanced three different explanations: first, that a colleague at the NIH was not producing the data for her; second, that she was awaiting publication of the results; and third, that she was dealing with personal medical issues at the time.[208] Nevertheless, Plaintiff and Dr. Vrana "did agree that it was unlikely to be funded if she didn't publish papers."[209]

In fact, the parties agree that the <u>primary duty</u> of a basic scientist like Plaintiff here is "to perform biomedical research and publish the results of the

---

[205] Id. at 34:13–17.

[206] Id. at 34:17–18.

[207] See ECF No 249 at 48 ¶ 181 ("Admitted with Clarification: Plaintiff did not miss a deadline, but disagreed with Dr. Vrana's pressure to do so, believing that until publishing results of the funded research it would be unwise to submit a renewal application.").

[208] See ECF No. 249 at 48 ¶ 181. ECF No. 231 Ex. 6 at 34:19–35:04.

[209] Id. at 34:25–35:01.

research."[210] Thus, in quite cyclical fashion, a research scientist's publications were inextricably linked with her ability to court external funding and enable further experimentation, further publication, and so forth. This "publish-or-perish" culture among institutions of higher education is well chronicled. However, between 2004 and 2007, the time period during which she was asked to bolster her scholarly contributions, Plaintiff published only one article.[211] Comparatively, Dr. Vrana noted that although there is "no hard and fast rule," faculty similarly situated to Plaintiff would be expected to publish, on average, ten to fifteen articles during any given three-year span.[212] In fact, Dr. Vrana published nineteen articles during that same period.[213]

Dr. Vrana made explicit that Plaintiff's lack of funding and diminished scholarly output accounted for her poor evaluations relative to male co-workers:

> Q.    You've explained in pretty good detail how you evaluated Dr. Summy-Long. Were there male colleagues of hers who also weren't getting things published at that time?
>
> A.    Were not getting things published? No, there were none.

---

[210] ECF No. 249 at 32 ¶ 114.

[211] ECF No. 249 at 49 ¶ 183.

[212] ECF No. 231 Ex. 6 at 58:07–20.

[213] Id. at 58:09–12.

Q.   There none?

A.   That were not getting things published.

Q.   What about the grants, getting grants renewed, did you have to have any conversations like this like you described you had with her with any male colleagues in the department?

A.   No. They all had funding at that time. Towards the end, Dr. Levenson may have—he lost his funding but got it right back. So I didn't have to have that conversation because he submitted lots of grants.[214]

With those considerations in mind, Dr. Vrana set all of the salaries in the

Pharmacology Department subject to administrative approval.[215] As he explained,

Plaintiff's "history of funding . . . was consistent with her being the lowest [paid].

And if you look at the number of grant dollars brought in up to that point or at that

point, she was the lowest. She hadn't published much in the preceding couple of

years."[216]

---

[214] Id. at 56:04–19.

[215] Id. at 21:18–20.

[216] Id. at 26:19–25. In terms of her absolute rather than relative pay, it should be noted for the record that Plaintiff did, however, receive three base salary increases of 7.9%, 2%, and 8% in years 2004, 2005, and 2006, respectively. Id. at 48:18–19; 29:23–30:02. The purpose of these increases, as Dr. Vrana explained, was to align as practicably as possible Plaintiff's base salary with the Association of American Medical College's 50th percentile—a national standard that the Defendants aspired to meet for each faculty member. Id. at 19:16–22.

Throughout her papers, Plaintiff takes issue with the characterization of her work as below that of her peers. However, nowhere does she adequately rebut these conclusions or show instead that a discriminatory animus influenced these discretionary decisions. Federal courts have consistently "recognize[ed] full well that it is not the judiciary's place to substitute its own judgment for that of a business manager whose day-to-day closeness with his firm's operations commands a certain deference."[217] In the education context, such deference requires that district courts remain "[w]ary of the Third Circuit's admonishment not to substitute our 'judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure.'"[218]

As previously noted, "should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."[219] The United States Court of Appeals for the Third

---

[217] Moore v. CVS Rx Servs., Inc., 142 F. Supp. 3d 321, 341 (M.D. Pa. 2015), aff'd, No. 15-3836, 2016 WL 4698261 (3d Cir. Sept. 8, 2016).

[218] Harel v. Rutgers, State Univ., 5 F. Supp. 2d 246, 266 (D.N.J. 1998), aff'd sub nom. Harel v. Rutgers, 191 F.3d 444 (3d Cir. 1999) (quoting Kunda v. Muhlenberg College, 621 F.2d 532, 548 (3d Cir.1980)).

[219] Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)

Circuit has explicitly instructed district courts who are disposing of a summary judgment motion in the employment discrimination setting as follows:

> [T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In other words, . . . a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons. While this standard places a difficult burden on the plaintiff, it arises from an inherent tension between the goal of all discrimination law and our society's

commitment to free decisionmaking by the private sector in economic affairs.[220]

Comparator evidence is "[e]specially relevant" at the pretext stage, where courts have emphasized that plaintiffs face "a rigorous standard" and a "difficult burden."[221] Still, the Seventh Circuit has emphasized that the search for similarly-situated comparators in employment discrimination cases is "flexible, common-sense, and factual" and should proceed if there are "enough common features between the individuals to allow a meaningful comparison."[222] Thus, "so long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied."[223] "We are looking for comparators, not clones."[224] This is particularly true in the academic setting, where although there

---

[220] Fuentes v. Perskie, 32 F.3d 759, 764–65 (3d Cir. 1994) (Becker, C.J.) (internal citations and quotations omitted) (emphasis in original).

[221] McDonnell Douglas, 411 U.S. at 804. Onyiah v. St. Cloud State Univ., 684 F.3d 711, 717 (8th Cir. 2012). Anderson v. Haverford Coll., 868 F. Supp. 741, 746 (E.D. Pa. 1994).

[222] Coleman v. Donahoe, 667 F.3d 835, 841 (7th Cir. 2012) (Hamilton, J.).

[223] Id. at 846 (internal quotation marks omitted).

[224] Id.

may exist generalized departments, each scholar has his or her own unique qualifications, research goals, and aptitudes.

Attempted identification of more favorably treated comparators is perhaps Plaintiff's lone course of action at the pretext stage. Otherwise, her papers are devoid of even the slightest indications of the type of invidious showing that the law requires to prevail at this juncture. She has not shown for instance, that the Defendants' explanation for her lower salary "is unworthy of credence" or that "discriminatory animus motivated" their salary decisions.[225]

In the portion of the statement of facts relating to comparator evidence, the Defendants have provided the following salary tables, which rank each faculty in the relevant departments from highest to lowest.[226] Each faculty member is represented as an "M" for "male" or an "F" for "female." In my view, these salary tables call into question the existence of pervasive sex-based salary disparity, as they show a wide dispersion among female faculty members in these two departments at the College of Medicine:

---

[225] Onyiah, 684 F.3d at 716.

[226] ECF No. 249 at 79 ¶ 294.

**Table 2. Departmental Salary Ranking by Sex**[227]

**Pharmacology Department:**

| | |
|---|---|
| 2003-04: | F, M, M, M, F |
| 2004-05: | F, M, M, M, F |
| 2005-06: | F, M, M, M, F |
| 2006-07: | F, M, M, F, M |

**Neural & Behavioral Sciences Department:**

| | |
|---|---|
| 2007-08: | M, F, M, M, F, F, M, M, F |
| 2008-09: | M, M, F, M, F, F, M, M, F |
| 2009-10: | M, M, F, M, F, F, M, M, F |

Perhaps the observation that stands out most strikingly from the above charts is that the highest paid faculty member in the Pharmacology Department during the operative time period was a woman. In fact, during her deposition, opposing counsel asked Plaintiff to guess which faculty might be the highest paid in each department. Plaintiff guessed correctly and described this particular co-worker as a "superstar" who "attracted NIH funding like two and three grants at a time" and consequently possessed an "astronomical" funding record.[228] The Plaintiff also guessed correctly as to the top two male wage earners in the Neural & Behavioral

---

[227] ECF No. 249 at 79 ¶ 294.

[228] Summy-Long Dep. ECF No. 231 Ex. 5 at III-471:06–10. In fact, Dr. Vrana testified that he thought sex played no role in his salary decisions, "[p]rimarily because my highest paid professor was a female, and my lowest paid faculty member was a female." ECF No. 231 Ex. 6 at 26:01–03.

Sciences Department, describing them as a "stand out" and "number one . . . as far

as attracting dollars," respectively.[229] Curiously, this blind exercise seems to, as

Defendants point out, support the position that compensation was tied to

performance, not sex.[230]

---

[229] ECF No. 231 Ex. 5 at III-472:21–III-473:05.

[230] See ECF No. 235 at 24. Plaintiff also points to two colleagues whom Defendants accurately point out were not responsible for substantially the same duties as she was. Those two individuals are Dr. Melvin Billingsley and Dr. Elliot Vesell—both named Defendants. However, since 2002, Dr. Billingsley has been the President and CEO of the Life Sciences Greenhouse of Central Pennsylvania and has spent the majority of his time working in that capacity. See Vrana Aff. ¶¶67-68, ECF No. 231-1; Pl.'s Dep. p. 271, ECF No. 231-5. Second, Dr. Vesell also held the title of Evan Pugh Professor in recognition of his service to the University and the scientific community and his publication record. The Pugh Professor title is the highest honor given to a Penn State faculty member. ECF No. 249 ¶¶ 231–32. In addition, prior to 2000, Dr. Vesell had served as the founding Chair of the Department of Pharmacology and had directed its activities for 32 years. Id. at ¶ 233.

Moreover, Defendants have argued as follow in their reply brief:

> Plaintiff states in her Response to Defendants' Statement of Facts that her closest comparators for salary purposes are Elliot Vesell, the long-time Chair of the Pharmacology Department, and Melvin Billingsley, President and CEO of the Life Sciences Greenhouse of Central Pennsylvania. The most glaring flaw in this argument is that the record contains no evidence whatsoever about Dr. Vesell's or Dr. Billingsley's compensation. This would ordinarily be a remarkable omission in a salary discrimination case. Here, however, it illustrates Dr. Summy-Long's continued penchant for making arguments that bear no relationship to the evidentiary record.

ECF No. 257 at 17 n.8.

Accordingly and as set out more fully below, Plaintiff has failed, in my view, to show that she was paid less for doing substantially similar work as departmental comparators. On this topic, I would also note for the record that Plaintiff's responses to Defendants' Local Rule 56.1 statement of material facts was particularly wanting in quality and conciseness, both on the issue of comparators in particular and on the whole. In addition, the rampant presence of first-person responses indicates that perhaps the client herself provided the rebuttal with little filtration on counsel's part—a facet unappreciated by this Court.[231] I memorialize this because it created unnecessary work, delayed expeditious resolution of this motion, and tended to hurt Plaintiff's case where her answers were entirely non-responsive and argumentative.

Her contentions regarding comparators in her statement of facts responses were especially problematic. For instance, Plaintiff contends somewhat obliquely that true comparators can come only from the Department of Pharmacology and not the Neural & Behavioral Sciences Department. This is a rather confusing claim, both because it lacks any explanatory backing and because Dr. Vrana had

---

[231] See, e.g., ECF No. 249 at ¶ 7 ("my research career"); ¶ 108 ("my work"); ¶ 158 ("my research program"); ¶ 206 ("I had hoped to be engaged as a full-fledged faculty member of NBS"); ¶ 304 ("my academic career"); ¶ 313 ("my office"); ¶ 319 ("I asked why I was not listed on the NBS webpage."); ¶ 325 ("my expressed concern"); ¶ 343 ("my NIH application").

previously testified that Plaintiff was the lowest performer in the Pharmacology

Department regardless. Even more opaquely, Plaintiff writes that "[t]enure is not a

requirement for a comparator identified by Plaintiff. Rank, having a Ph.D. degree

and being a male full-time faculty member with a Standing appointment in the

Department of Pharmacology are required factors."[232]

With all due respect to Plaintiff, it is the Court's duty to determine the subset

of individual who may appropriately be viewed as her comparators as a matter of

law. Comparators, as explained above are just that: individuals possessing

substantially similar qualifications and experiences such that comparison of their

salaries with the complainant is facially reasonable. They need not be "clones" or

"perfect matches." In addition, Plaintiff should consider that too narrow a

construction of what it takes to be a comparator favors the defense argument that

salary setting among faculty is a highly individualized process about which few

comparative conclusions may properly be drawn. These notions are especially true

where Plaintiff's interrogatories have previously assented to a broader conception

of what it means to be a comparator in this case:

> 12.   [I]dentify all employees who you contend do or did equal work to
> you, the performance of which requires or required equal skill, effort
> and responsibility.

---

[232] ECF No. 249 at 59 ¶ 221.

> **ANSWER**: Professors of Pharmacology—Drs. Melvin Billingsley, Robert Levenson, Kathleen Mulder, Mark Kester, Joan Lakoski, and Charles Smith . . . . Dr. Elliot Vesell would also be a comparator . . . . Professors in the Department of Neural and Behavioral Sciences include Drs. Kevin Alloway, Barry Dworkin, Patricia S. Grigson, Patricia McLaughlin, Robert Milner, Ralph Norgren, Thomas Pritchard, Ian Simpson, Joyce Tomran-Tink and Ian Zagon. [233]

To summarize, Dr. Vrana testified that no other comparable faculty member had fallen behind on his or her funding and publication expectations to the extent that the Plaintiff had. In turn, the Plaintiff fails to respond with any affirmative evidence that Dr. Vrana's explanation is pretextual. To the contrary, she seems to openly acknowledge that the top academic performers—the "superstars"—were the most handsomely compensated employees. That is really the end of the story in my view, at least as far as any alleged sex discrimination goes. In no fashion has she shown that she was paid less than male comparators for doing equal work.[234]

---

[233] ECF No. 210 Ex. 1 at

[234] As counsel for Defendants aptly put it, this shortage of factual supports "seems to be of no moment to Dr. Summy-Long (or her attorney)." ECF No. 235 at 30. I would note that Defendants filed their answer on August 14, 2006, ECF No. 7, before the Supreme Court handed down its heightened pleading regime decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). It is doubtful to me that the instant complaint would have survived a motion to dismiss under when scrutinized through the lens of those cases.

District courts in this Circuit have been asked to remain "[w]ary of the Third Circuit's admonishment not to substitute our judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure." Likewise, as the Eighth Circuit has stated, "We will not invade a university's province concerning academic matters in the absence of compelling evidence that the academic policy is a pretext for discrimination."[235]

In her reply brief, Plaintiff also enumerates four rather obscure averments that she says corroborate her claim that the Defendants have acted out of a discriminatory animus all along. According to Plaintiff, her poor performance relative to her peers was merely a red herring. All four of these suggestions suffer the same flaws: their factual backing in the record is highly questionable and their truth, even if assumed, does little to nudge the needle toward a showing of pretext.

Her first suggestion of pretext is that the Haignere Report examined a single year rather than a span of three years, as originally contemplated.[236] I agree with the Defendants that this explanation lacks any "logical connection" to the issue of pay versus performance.[237] Further, even if true, it is evident from the record that

---

[235] <u>Amir v. St. Louis Univ.</u>, 184 F.3d 1017, 1029 (8th Cir. 1999).

[236] ECF No. 244 at 23.

[237] ECF No. 257 at 18.

the Haignere study was the Defendants' attempt to obtain a neutral, third-party

evaluation of faculty salaries. It is somewhat incongruous, to say the least, that

Plaintiff would later hammer away at the very piece of evidence that she claims

forms the linchpin of her lawsuit.

> Plaintiff's second example relating to pretext reads as follows:

> Second, recognizing that "salary compression" was an issue for long serving faculty such as Summy-Long, the administration considered "longevity pay" and then rejected it. As Dean Kirch told the women, the "pool of money is only so large." According to Controller Wayne Zolko, that amount of money was $1.5 million. Consequently, it is clear that reaching pay equity was never the concern, the issue was money.[238]

The Court takes issue with this contention. First, like several other portions of

Plaintiff's briefing, the allegation is comprised of a hodgepodge of distinct out-of-

context quotations and historical events that are woven together in a way to gin up

a sense of impropriety. For instance, Plaintiff comingles discussions of initial

salary setting and subsequent remedial measures, which share only a surface-level

relationship. Even more damaging, however, the Plaintiff's suggestion that money

was an issue is self-evident. Of course, universities are constrained by available

revenue when setting salaries. The Defendants here are no different. Without

---

[238] ECF No. 244 at 44.

affirmative evidence of discrimination, considering financial restraints was fiscally responsible, not violative of the law.

Plaintiff next suggests that the poor performance explanation is merely pretextual because the Defendants cancelled a second study by Dr. Haignere.[239] According to Plaintiff, the Defendants were "not interested in knowing the true state of female pay inequity" but decided to "lawyer up" and "cover their tracks."[240] As an initial matter, the Court is not sure what to make of these emotive appeals better suited for inclusion in a closing argument to a jury than in summary judgment briefing typically characterized by argumentation and intellectual rigor.

Like all of Plaintiff's prior suggestions, the fact that the Defendants hired lawyers to contest the instant lawsuit is rather unremarkable and lacking in force as to the pretext issue. Undoubtedly, defendants hire lawyers to battle meritorious and frivolous lawsuits alike. In fact, the Defendants' answer that this second study was discontinued because "recently-enacted federal regulations and federal court decisions . . . raise[d] questions about statistical studies of this kind with regard to the methodology, the validity of the conclusions, or the actions taken in

---

[239] ECF No. 244 at 24.

[240] ECF No. 244 at 22–24.

response."[241] That explanation was provided by the Defendants to the faculty in November 2007 and cited by Plaintiff in this case as early as September 2008.[242] The Court is again left not with a burning inference of pretext but with the mumbled question, "So what?"

Lastly, the Plaintiff points out that Dr. Vrana termed her performance as "falling behind . . . her peers" during his testimony after having helped to secure Plaintiff a modest raise.[243] Certainly, this must be the long-awaited, pretextual smoking gun: a seemingly self-serving and contradictory statement by a supervisor made solely for the purpose of the litigation. That would perhaps be the case but for the lapse of eleven years between the annualized raise and the performance deposition comment and four years between the annualized raise and Plaintiff's eventual departure from the Pharmacology Department.[244] The earlier annualized raise also prioritized a variety of factors beyond performance, including the

---

[241] ECF No. 257 at 18 (citing Nov. 20, 2007 Dean Kevin Grigsby Memo to Faculty Organization, ECF No. 67 at 78).

[242] See id.

[243] ECF No. 244 at 24.

[244] See Vrana Dep., ECF No. 231 Ex. 6 at 33:13–34:02.

national salary figures published by Association of American Medical Colleges

("AAMC").[245]

In fact, then Department Chair Dr. Vrana testified as to the following during

his deposition:

> Q.   Do you remember how you evaluated her performance in 2005, 2006, and 2007?
>
> A.   Yes. So in each case, as I said earlier, she was an excellent and conscientious instructor, and so I acknowledged that. But each year, we had a recurring discussion about the fact that she was not publishing her work. She was missing opportunities to submit the grant for renewal. And so by the end, I was committing to cover 100 percent of her salary and her technician from 2007 to 2008. She subsequently left the department in 2007 before that happened. But the fact of the matter was it was increasingly apparent that her performance was falling behind the others—her peers within the department and nationally.[246]

Thus, it could very well be the case, as the Defendants here propose, that to the

extent that Plaintiff's salary was lower than other of her co-workers, the evidence

suggests the problem was not with her sex but with her performance.

---

[245] (Vrana Affidavit ¶¶61-63, ECF No. 231-1, p. 10- 11; Pl.'s HR40 Evaluations, ECF No. 231-11).

[246] ECF 231 Ex. 6 at 33:14–34:02.

**D.    There is no genuine dispute of material fact as to Plaintiff's claims under the Pennsylvania Human Rights Act, Title IX, or the Pennsylvania Equal Rights Amendment.**

Title VII and the Pennsylvania Human Rights Act (PHRA) both "make it illegal for an employer to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment on the basis of sex."[247] "The two acts are substantially similar, and Pennsylvania courts generally interpret the PHRA consistent with Title VII."[248] "The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably."[249]

Such an approach is reasonable: the two pieces of legislation regulate substantially similar conduct as often applied to an identical fact pattern. If one claim is substantively defective, so should the other claim fail. Thus, courts have rightly explained that "the disposition in Plaintiff's Title VII claim applies with equal force to [her] PHRA claim."[250] Accordingly, Defendants' are entitled to

---

[247] Nagle v. RMA, The Risk Mgmt. Ass'n, 513 F. Supp. 2d 383, 387 (E.D. Pa. 2007).

[248] Id.

[249] Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001).

[250] Sapko v. Ringgold Area Sch. Dist., No. 2:06CV893, 2008 WL 2367321, at *6 n.5 (W.D. Pa. June 10, 2008). See also Marriott v. Audiovox Corp., No. CIVA 04-1307, 2006 WL 3805145, at *4 (W.D. Pa. Dec. 22, 2006) ("The discussion

summary judgment on Plaintiff's sex discrimination claim brought pursuant to the PHRA.

The same applies with equal force to Plaintiff's Title IX sex discrimination claim, as "Title IX freely borrows the jurisprudence of Title VII."[251] Thus, "[f]ollowing the Supreme Court's lead in turning to Title VII jurisprudence for Title IX cases, lower courts have adopted the Title VII framework to analyze Title IX [ ] claims."[252] Therefore, "[a] considerable body of case law instructs that when analyzing a Title IX claim courts should apply Title VII jurisprudence."[253]

This Title VII–Title IX reciprocation of standards applies to a plaintiff's failure to establish a prima facie case[254] just as it does to her failure to demonstrate

---

and disposition of plaintiff's Title VII claims will apply to the related PHRA claims and will be granted or denied in the same manner as the Title VII claims.").

[251] Dawn L. v. Greater Johnstown Sch. Dist., 586 F. Supp. 2d 332, 381 (W.D. Pa. 2008).

[252] Atkinson v. Lafayette Coll., 653 F. Supp. 2d 581, 594 (E.D. Pa. 2009). See also Toth v. California Univ. of Pennsylvania, 844 F. Supp. 2d 611, 636 (W.D. Pa. 2012).

[253] Bruneau By & Through Schofield v. S. Kortright Cent. Sch. Dist., 935 F. Supp. 162, 170 (N.D.N.Y. 1996).

[254] Mabry v. State Bd. of Cmty. Colleges & Occupational Educ., 813 F.2d 311, 317 n.6 (10th Cir. 1987) ("Because Title VII prohibits the identical conduct prohibited by Title IX, i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards.").

pretext.[255] For the reasons discussed above, such a transposition of legal standards to identical factual patterns makes practical sense and conserves the resources of the courts and the parties. Thus, because Plaintiff cannot establish a prima facie case or show pretext, Defendants are also entitled to summary judgment on Plaintiff's sex discrimination claim brought pursuant to Title IX.[256]

Plaintiff also brings a claim under the Equal Rights Amendment to the Pennsylvania Constitution, which provides that "[e]quality of rights under the law

---

[255] Stucky v. Hawaii, No. CIV 0600594 JMS/KSC, 2008 WL 214944, at *17 (D. Haw. Jan. 25, 2008) ("[E]ven if Plaintiff had set forth a prima facie case, her Title IX claim must fail for the same reason as her Title VII claim; she fails to demonstrate pretext.").

[256] The same conclusion must be true of Plaintiff's conspiracy claim brought pursuant to 42 U.S.C. § 1985. To establish a conspiracy claim under 42 U.S.C. §1985(3), a plaintiff is required to show: (1) a conspiracy between two or more persons, (2) for the purpose of depriving her of the equal protection of the laws, and (3) an act in furtherance of the conspiracy, (4) whereby she was deprived of a right or privilege of a citizen of the United States. See Slater v. Susquehanna County, 465 Fed.Appx. 132, 136 (3d Cir. 2012). Thus, Plaintiff's conspiracy claim requires her to show that the Defendants acted together, motivated by a discriminatory animus towards women, to deprive her of her legal rights. Id. at 136. I agree that "Plaintiff falls woefully short of identifying evidence that would carry this burden." ECF No. 235 at 32–33. As Defendants point out, "In the first instance, many of the Defendants worked at the College of Medicine at different times." Id. at 33. Clearly, then they did not find themselves "in a position to conspire with each other about faculty salary decisions or any other matters." See Kerstetter v. Pennsylvania Dep't of Corrections, 2010 WL 936457, *14 (M.D. Pa. 2010) (holding that §1985 requires "a meeting of the minds" among the alleged co-conspirators).

shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."[257] The Amendment has been interpreted as circumscribing the conduct of government entities in the formulation, interpretation and enforcement of statutes or common law doctrines predicated on stereotypical gender roles.[258]

Where a case does not implicate a discriminatory statute or common law doctrine, however, the Equal Rights Amendment does not apply. This was clarified by the Pennsylvania Supreme Court's narrow construction of the Amendment in Weaver v. Harpster. In that case, the Court held that the plaintiff did not have an actionable Equal Rights Amendment claim, stating:

> [W]e have applied the Equal Rights Amendment to invalidate legislation embodying gender classifications. We have not invoked the Equal Rights Amendment to provide a private cause of action for tort. . . . [Plaintiff] has not identified any law under which she is being discriminated against. She is not being denied equal rights under the law due to her gender.[259]

---

[257] Pa. Const. Art. 1, §28.

[258] See Hartford Acc. and Indem. Co. v. Insurance Com'r of Com., 482 A.2d 542, 549 (Pa. 1984). See also Adoption of Walker, 360 A.2d 603 (Pa. 1976); DiFlorido v. DiFlorido, 331 A.2d 174 (Pa. 1975); Hopkins v. Blanco, 320 A.2d 139 (Pa. 1974).

[259] 975 A.2d 555, 572 (Pa. 2009).

For that reason, and because Plaintiff's Equal Rights Amendment claim would also fail on the merits as described throughout, summary judgment is again appropriate in favor of the Defendants as to that claim.

### E.   There is no genuine dispute of material fact as to Plaintiff's claims under the Equal Pay Act and the Pennsylvania Equal Pay Law.

Plaintiff appeals to both the Pennsylvania Equal Pay Act and the Federal Equal Pay Act. However, federal courts in Pennsylvania have previously clarified that the federal law preempts its state-law counterpart. "[P]laintiff has invoked coverage of the Federal [Equal Pay] Act, and, therefore, is excluded from a claim under the Pennsylvania Act."[260] "Plaintiff also brought claims under the Pennsylvania Equal Pay Law, which she concedes are precluded by her EPA suit."[261] Plaintiff does not dispute this conclusion in her brief. Therefore, summary judgment is granted in favor of Defendants on the Pennsylvania Equal Pay Law, and I will proceed to analyze her claim through the federal framework.

The Equal Pay Act reads as follows:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by

---

[260] Cap v. Lehigh Univ., 433 F. Supp. 1275, 1283 (E.D. Pa. 1977).

[261] Lord v. Pennsylvania Nat. Mut. Cas. Ins. Co., No. 1:07-CV-1229, 2009 WL 55949, at *3 (M.D. Pa. Jan. 7, 2009) (Conner, J.) (internal citations omitted).

paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex, provided that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.[262]

"To establish a prima facie case under the Equal Pay Act, a plaintiff must show that defendant paid different wages to employees of the opposite sex for equal work on jobs which required equal skill, effort, and responsibility, and all of which are performed under similar working conditions."[263] "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different."[264] "Substantial similarity" is determined not by official titles but by

---

[262] 29 U.S.C. § 206(d)(1).

[263] <u>Wildi v. Alle-Kiski Med. Ctr.</u>, 659 F. Supp. 2d 640, 657–58 (W.D. Pa. 2009).

[264] <u>Brobst v. Columbus Servs. Int'l</u>, 761 F.2d 148, 156 (3d Cir. 1985).

"actual job content."[265] "Ultimately, a finding that jobs entail equal work must be decided on a case-by-case basis."[266]

"If a plaintiff is able to make a prima facie case, the burden shifts to the defendant. The defendant can raise one of the four affirmative defenses stated in the Equal Pay Act."[267] As such, "[a] difference in payment between opposite sexes is permissible if it is made pursuant to: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a system based upon any other factor other than sex (the 'catchall defense')."[268]

Given their marginally distinct allocation of burdens, courts have noted that "[i]t is possible that a plaintiff could fail to meet its burden of proving a Title VII violation, and at the same time the employer could fail to carry its burden of proving an affirmative defense under the Equal Pay Act."[269] However, when a Title VII claim is so similar to and tends to merge with the Equal Pay Act claim, for instance, by claiming pay discrimination but being defeated by a legitimate non-

---

[265] Id. at 151, 155.

[266] Puchakjian v. Twp. of Winslow, 804 F. Supp. 2d 288, 295 (D.N.J. 2011), aff'd, 520 F. App'x 73 (3d Cir. 2013).

[267] Wildi, 659 F. Supp. 2d at 658.

[268] Id.

[269] Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 344 (4th Cir. 1994).

discriminatory reason that would also satisfy one of the Equal Pay Act's statutory

defenses, a loss on the Title VII claim is likely fatal for the plaintiff.[270]

As a result, courts have recognized that the dispositions of claims brought

pursuant to the Equal Pay Act "are authoritative" in cases where plaintiffs also

"raise a claim of equal pay" under Title VII.[271] Thus, whether viewed as a failure to

show that she was paid less than male co-workers who performed substantially

similar work at the prima facie stage or as the Defendants' success in showing that

---

[270] Reiff v. Bd. of Regents of the Univ. of Wisconsin Sys., No. 13-CV-192-JDP, 2014 WL 4546041, at *13 (W.D. Wis. Sept. 12, 2014) ("To the extent that Reiff bases her Title VII claim on the theory that she has received discriminatory pay during the limitations period, that claim fails because UWS has shown that any pay differential between Reiff and her comparators is due to factors other than sex. Thus, her Title VII claim fails for the same reason her Equal Pay Act claim fails."); Parr v. Nicholls State Univ., No. CIV. A. 09-3576, 2011 WL 838903, at *8 (E.D. La. Mar. 3, 2011), aff'd sub nom. Parr v. Hulbert, 518 F. App'x 275 (5th Cir. 2013), and aff'd sub nom. Parr v. Hulbert, 518 F. App'x 275 (5th Cir. 2013) ("Specifically, for essentially the same reasons stated with respect to Plaintiff's EPA claim, any assertions of gender discrimination by Plaintiff relative to her pay rate fail because she does not show that Kaslow or Cheramie was 'similarly situated.'"). See also Clark v. Johnson & Higgins, 181 F.3d 100 (6th Cir. 1999) ("This court has held that when an Equal Pay Act claim and a Title VII claim arise out of the same set of underlying facts, both stating a charge of wage discrimination, the standards of liability under the two statutes are sufficiently similar that the disposition with respect to the two claims should be the same.") (internal citations and quotation marks omitted).

[271] Gunther v. Washington Cty., 623 F.2d 1303, 1313 (9th Cir. 1979), aff'd, 452 U.S. 161, 101 S. Ct. 2242, 68 L. Ed. 2d 751 (1981).

salary differences were based upon merit or seniority, I hold that the Defendants are also entitled to summary judgment as to Plaintiff's Equal Pay Act claims.

For instance, in <u>Equal Employment Opportunity Commission v. Cleveland State University</u>, the United States District Court for the Northern District of Ohio held that "the evidence establishes that any difference in salaries between male and female professors in the Cleveland State Mathematics Department is justified under a seniority or merit system."[272] That was because the university's "written personnel policies base[d] a merit system on competent teaching and research."[273] Moreover, just as Dr. Vrana illustrated, the plaintiff's department in <u>Cleveland State University</u> "effected this policy by compensating competent teachers with average salary increases and rewarding research and publication with better than average salary increases."[274] Like here, that procedure pointed to a "sex-neutral" application of a merits system and therefore did not violate the Equal Pay Act.[275]

Again, in <u>Willner v. University of Kansas</u>, the United States Court of Appeals for the Tenth Circuit upheld the finding that a valid merits system existed

---

[272] No. C80-311, 1982 WL 320, at *13 (N.D. Ohio May 10, 1982).

[273] <u>Id.</u>

[274] <u>Id.</u>

[275] <u>Id.</u> at *14.

in the higher education context, where, as here, "[d]ocumentary evidence was presented, including evaluation forms used by the faculty committee, faculty handouts explaining the merit system, and minutes from faculty meetings where the system was discussed."[276] Accordingly, there was no Equal Pay Act violation since "faculty members were judged on the basis of quality of their instruction, their research, and service."[277]

As previously indicated, I have determined that summary judgment in favor of the Defendants is appropriate on Plaintiff's Equal Pay Act claim for two related reasons. First, Plaintiff did not perform substantially the same work as her co-workers, given that the record indisputably reveals her scholarly output and grant awards were not only the lowest in the Pharmacology Department during the operative period but had fallen well below accepted standards even accounting for the somewhat cyclical nature of such endeavors. In Chang v. University of Rhode Island, for example, the district court rejected an Equal Pay Act Claim based on the absence of "substantially similar" work in the academic setting where appealed-to comparators had "administrative or coaching duties" that the plaintiff did not have or benefited from the availability of grant funding that was not applicable to the

---

[276] 848 F.2d 1023, 1031 (10th Cir. 1988).

[277] Id.

plaintiff.[278] As in <u>Chang</u>, this Court "rejects out of hand the notion that, like Gertrude Stein's storied rose, a professor is a professor is a professor."[279]

Conversely, the same conclusion is reached when considering the applicable merits system here, a system that rewarded scholarly output and the attainment of prestigious national grants with discretionary salary increases. As the parties acknowledge, starting salaries were a function of several variables, including the faculty member's rank at hire, experience, and specific expertise.[280] Likewise, faculty salaries are affected by market factors, such as the demand for and prestige of a particular discipline.[281] Again, in addition to annual base salary increases, a professor's salary might also be increased for promotion or for other merit-based determinations.[282]

Merit-based increases were determined by the Department Chair—in Plaintiff's case, Dr. Vrana.[283] The Department Chair would allot merit increases

---

[278] <u>Chang v. Univ. of Rhode Island</u>, 606 F. Supp. 1161, 1243 (D.R.I. 1985).

[279] <u>Id.</u> at 1219.

[280] ECF No. 249 at 11 ¶ 45.

[281] <u>Id.</u> at 12 ¶ 46.

[282] <u>Id.</u> at 12 ¶¶ 48–52.

[283] <u>Id.</u> at 13 ¶ 53.

from a limited pool of funds, and by definition, faculty members received distinct merit increases, if any, depending on their annual achievements.[284] The amount of a faculty member's annual merit increase was generally a function his or her level of performance.[285] Moreover, as Dr. Vrana explained about Plaintiff's performance in particular, "her history of funding . . . was consistent with her being the lowest [paid]. And if you look at the number of grant dollars brought in up to that point or at that point, she was the lowest. She hadn't published much in the preceding couple of years."[286] In comparison, none of Plaintiff's male colleagues experienced similar shortages in funding or publications.[287] Accordingly, Defendants would satisfy the merits system exception to the Equal Pay Act and summary judgment is also appropriate as to that claim for this independent reason.

---

[284] Id. at 13 ¶¶ 54–55. See also Vrana Dep. pp. 41-42, ECF No. 231-6; Zolko Dep. p. 64, ECF No. 231-8; Base Salary History for Summy-Long and Colleagues, ECF No. 228, Exhibit 101; Vrana Dep. pp. 41-42, ECF No. 231-6.

[285] Id. at 14 ¶ 56. See also Zolko Aff. p15, ECF No. 44-2, p. 16; Grigsby Dep. pp. 99-102, ECF No. 231-7)

[286] Vrana Dep. at 26:12–25.

[287] Id. at 56:04–19.

## II.      There Is No Genuine Dispute Of Material Fact With Respect To Plaintiff's Retaliation Claims.

For the reasons that follow, there is no genuine dispute of material fact as to whether the Defendants retaliated against Plaintiff on the basis of her protected activity. Accordingly, Defendants' motion for summary judgment is granted as to the following counts: Count V (Title VII Retaliation); Count VI (Title IX Retaliation); Count VII (Pennsylvania Human Relations Act Retaliation)[288]; and Count VIII (First Amendment Retaliation).

Title VII's "[a]ntiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."[289] Accordingly, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[290]

---

[288] See Part I.D (quoting Nagle v. RMA, The Risk Mgmt. Ass'n, 513 F. Supp. 2d 383, 387 (E.D. Pa. 2007) ("The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.")). Accordingly, for the same reasons that Plaintiff's Title VII retaliation claim fails, her PHRA retaliation claim must also fail.

[289] Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).

[290] Id. at 68.

As the Supreme Court explained in Burlington Northern, it elected to speak in terms of "material adversity" because it was necessary "to separate significant from trivial harms."[291] It has therefore been observed that Title VII was not intended as "a general civility code for the American workplace," and often "[p]erceived unkindness has no remedy at law."[292]

"A prima facie case of illegal retaliation requires a showing of (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[293] "An adverse employment action usually must constitute "a materially adverse change in the terms of . . . employment, such as termination, demotion accompanied by decrease in salary, material loss of benefits, or significant decrease in responsibilities."[294] "To establish the requisite causal connection a

---

[291] Id.

[292] Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); Zaloga v. Borough of Moosic, No. 3:10-CV-2604, 2015 WL 3755003, at *11 (M.D. Pa. June 16, 2015).

[293] E.E.O.C. v. Allstate Ins. Co., 778 F.3d 444, 449 (3d Cir. 2015) (Hardiman, J.) (internal quotation marks omitted).

[294] Mitchell v. Vanderbilt Univ., No. 3:01-1578, 2003 WL 24135107, at *9 (M.D. Tenn. Mar. 18, 2003), aff'd, 389 F.3d 177 (6th Cir. 2004) (citing Kocsis v.

plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[295]

Lastly, as a matter of law, after the Supreme Court's recent decision in University of Texas Southwestern Medical Center v. Nassar, "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test."[296] "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[297]

Plaintiff's retaliation claims are perhaps the weakest of the lot, as they lack in both material adversity and causation. Plaintiff's first retaliation claim is that her lab space was reduced as a consequence of her complaints of sex discrimination. As other federal courts have previously held in the education context, "Defendant's reduction of Plaintiff's lab space was not an adverse employment action," because "[r]educing Plaintiff's lab space does not rise to the level of a firing, demotion, or

_____

Multi-Care Mgmt., Inc., 97 F.3d 876, 885-86 (6th Cir.1996) (citations omitted); Dollis v. Rubin, 77 F.3d 777, 782 (5th Cir.1995)).

[295] Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

[296] Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

[297] Id.

loss of benefits."[298] Moreover, a plaintiff cannot succeed on a lab space retaliation claim where she is "unqualified" and cannot "demonstrate that [s]he was meeting Defendant's legitimate expectations and was performing to its satisfaction."[299] Again, this is particularly true where, as here, the plaintiff "attacks a policy pursuant to which lab space is allocated among faculty throughout the Medical School on the basis of each faculty member's access to external and, particularly, federal funding."[300]

Defendants have shown that lab space was allocated, in nearly all instances, in accordance with a faculty member's external grant funding (of which Plaintiff had little to none during the operative period).[301] Further, Plaintiff appears to contend that she was guaranteed an agreed-upon lab space in the Pharmacology Department before her transfer to the Neural & Behavioral Sciences Department, but that her lab space was reduced upon joining her new department. "Had it been made clear before I transferred that my laboratory space would be approximately

---

[298] Mitchell, 2003 WL 24135107, at *9.

[299] Id. at *8.

[300] Naftchi v. N.Y. Univ., 14 F. Supp. 2d 473, 487 (S.D.N.Y. 1998).

[301] ECF No. 249 at 82 ¶ 309. See also Barnstable Aff. ¶13, ECF No. 231-2; Pl.'s Dep. p. 443, ECF No. 231-5; Vrana Dep. p. 32, ECF No. 231-6; Facilities Research Metrics, ECF No. 231-40.

half the size, I would not have done so," she wrote regretfully in her response to Defendants' statement of material facts.[302]

The Court recognizes that the reduction in lab space was potentially disappointing to Plaintiff, but nothing in the record indicates that the reduction was due to any factor other than her voluntary transfer of departments and her being the Neural & Behavioral Sciences Department's newest addition. This is particularly true given the alleged existence of a guaranteed space were she to remain with the Pharmacology Department. I therefore agree with Defendants that "[g]iven the circumstances, there is nothing suspect about the amount of lab space Plaintiff had and no evidence to suggest that it was related to her gender or her protected activity."[303] Accordingly, this claim of retaliation fails to show both material adversity and causation, and it fails as such.

---

[302] ECF No. 249 at 82 ¶ 307.

[303] ECF No. 235 at 31. See aslo Packer v. Trustees of Indiana Univ. Sch. of Med., 800 F.3d 843, 851–52 (7th Cir. 2015):

> Packer also pursues a claim of retaliation under Title VII, contending that the University took a series of adverse actions against her (including denying her pay raises and then decreasing her pay, and depriving her of adequate research lab space) because of the complaints she had filed internally with the University's office of equal opportunity and externally with the EEOC. But in her summary judgment memorandum below, Packer only devoted a few sentences to explaining the evidentiary basis for this claim. . . . The problem,

Next, Plaintiff contends that certain individuals associated with the Defendants took actions that negatively impacted her healthcare. Though seeming serious at first, the claim, as eventually expressed by Plaintiff in her response, is so obscure that it is difficult to untangle. Plaintiff writes as follows:

> Of great effect at this time, and a deterrent from her job responsibilities, were the emotional and devastating concerns of not being able to get a diagnosis and second opinion of a skin tumor biopsied in February, 2005, by Dr. Anderson (Nevus, Exhibit 42), but incompletely diagnosed (spindle cell neoplasia; possible neurofibroma; malignant fusiform cell type; Exhibit 43) without ruling out melanoma (i.e. spindle cell melanoma) by Dr. Klaus Helm, a member of the Clinical Faculty of the COM, Department of Patholog [sic]. This happened just 2 months after Plaintiff filed the Complaint with the PA Human Relations Commission (PHRC).

> Concerned since spindle cell neoplasia can be spindle cell melanoma, a fact well understood by Dr. Helm (Exhibit 46). Plaintiff began a quest to obtain a diagnosis lasting to this day (Summary of Physicians recorded at Plaintiff's deposition, July 2015). Later complications, believed related to the spindle cell neoplasia and continuing retaliation, occurred in February, 2012, when biopsied tissue from an inflamed encrusted mole, was sent to Dr. Helm for pathological analysis despite Plaintiff's expressed concerns and request not to. This

---

though, is that Packer's abbreviated analysis of the claim made no effort to weave such evidence into a cogent argument, grounded in the case law, as to why a factfinder might be able to conclude that Brater and the University had embarked on a course of retaliatory conduct because she had engaged in protected conduct. Nor, apart from the direct framework for establishing retaliation, did Packer offer any suggestion as to how she might establish retaliation indirectly. In short, Packer's cursory treatment of the retaliation claim was wholly insufficient and, in our view, waived.

time Dr. Helm provided a misdiagnosis of squamous cell carcinoma (Exhibit 47; Exhibit 48) with recommendation of further excision that showed no cancer present, but failed to rule out melanoma requested by the dermatologist (new doc#402, p. 1-3). Dr. Helm, in 2005 (Exhibit 44) and Dr. Charles Pagana, Plaintiff's general practitioner in 2012, assured me of not having melanoma, but that was untrue as a summary by Dr. Pagana of my health issues for insurance coding, showed my having a History of Melanoma. A continuing retaliation complaint was submitted to the EEOC in 2012 and Plaintiff began alternative medical therapy to "treat" melanoma, assuming that Dr. Helm's failure to release skin tumor tissue for a second opinion wouldn't have happened if it were benign.[304]

Again, while the Court has strived to read and view the entire record in the light most favorable to Plaintiff, review of such convoluted responses to simple factual inquiries hindered prompt disposition of this motion and certainly did not help to advance Plaintiff's case like concise, direct statements may have. Nevertheless, the individuals named above, as Defendants aptly note, have never even been named parties to this lawsuit. Separately, there is no indication that the alleged shortcomings in the aforementioned biopsy were actually shortcomings when viewed objectively, were unable to be remedied, or were in any way motivated by protected activity.

---

[304] ECF No. 249 at 48–49 ¶ 181.

Moreover, this Court has previously precluded advancement of such a claim. On May 28, 2015, I granted Defendants' motion for a protective order as to additional discovery on this claim, explaining as follows:

> The instant action, sounding entirely in employment discrimination, was commenced by Plaintiff on June 2, 2006, nearly nine years ago. Plaintiff recently noticed the depositions of two non-party physicians, who according to the allegations of Plaintiff, misdiagnosed Plaintiff's medical condition. This alleged misdiagnosis, wholly unrelated to the instant action, is not alleged in the complaint, and in the ensuing nine years since Plaintiff filed her complaint, has never previously been alleged.[305]

For those reasons, this claim is also unavailing.

Next, Plaintiff suggests that Defendants retaliated against her by not timely placing her profile on the Neural & Behavioral Sciences Department's website after she transferred departments. For reasons that should be obvious, that is not a materially adverse retaliatory act. Perhaps the outcome would be different in the case of saleswoman or a realtor whose online profile was a primary engine of customer leads, but for a university professor whose web presence typically acts as a repository for her class schedule, office hours, and working papers, the story is much different. Further, as the Defendants admit, "the website was out of date for several years while Plaintiff was in the department and that her name (along with

---

[305] ECF No. 184.

others) was omitted from the website."[306] That is an unremarkable and uncontroverted notion, and this claim therefore fails on the merits.

Lastly, Plaintiff suggests that she was mistreated by faculty in the Pharmacology Department, primarily Dr. Vrana, the Department Chair, which forced her transfer to the NBS Department. Plaintiff cites to two particular instances of retaliation: first, that Dr. Vrana omitted her name in an article about the history of the Pharmacology Department; and second, that an administrative assistant in the Pharmacology Department was rude to her when she submitted a grant application to be processed.[307] As Plaintiff herself recounted, "[t]his was very devastating to [me] with loss of respect from the staff and perpetuated a negative work environment that was growing unbearable day, by day."[308]

Again, I would question the materiality of these claimed retaliatory acts. In fact, as the Defendants point out, the contested article actually contained the following statement: "The first graduate student [in the Pharmacology Department] was Joan Summy-Long, who later became a full professor in the Department."[309]

---

[306] ECF No. 235 at 31.

[307] See ECF No. 249 at 88–89 ¶¶ 336–44.

[308] Id. at ¶ 341.

[309] Id. at ¶ 340.

Moving on to the second allegation, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[310] "Properly applied," this standard "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language."[311] The record reveals that the dispute between the Plaintiff and this particular staff member arose when Plaintiff allegedly submitted her grant application materials in an untimely fashion.[312] In fact, according to Dr. Vrana, the administrative staff became frustrated with

---

[310] <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998).

[311] <u>Id.</u> at 788.

[312] Further, Plaintiff alleges that she was retaliated against in violation of the First Amendment to the United States Constitution. As the elements and defenses of such a claim parallel those previously discussed, summary judgment is also warranted as to that allegation. "The elements of a retaliation claim under 42 U.S.C. § 1983 predicated on the First Amendment and under the Rehabilitation Act are the same. In both cases plaintiffs must show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action."[312] "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity."[312]

Plaintiff when a belated application formatting submission resulted in "a lot of last second work that required that they stay late at night."[313]

This case and its questionable retaliation claims highlight a stark reality litigants in the academic setting may fail to consider when they file tenuous claims of discrimination against their colleagues: that those colleagues look unfavorably back at them or choose to distance themselves for obvious reasons does not always rise to the level of actionable retaliation. Instead, those repercussions may simply be reasonable responses to having been named as a defendant in federal court. Filing a lawsuit of that magnitude against one's colleagues or supervisors often turns out to be an apt way to burn bridges in the long run.

## CONCLUSION

One might analogize that Plaintiff set out to build a magnificent home, a home full of intricate designs whose construction required a certain precision, strategy, and skill. However, over the course of ten years, the Plaintiff, for whatever reasons, fired five different architects and raised picayune issues that further delayed construction and sometimes, even halted it altogether.

It can come as no surprise now looking back that the final product remains unfinished, a conglomerate of distinct styles and divergent priorities. Yet, even the

---

[313] Vrana Dep. at 52:23–25.

most ornate blueprints, if not the beneficiary of proper care, can disappoint the builder in the long run—particularly if, as here, she has quite plainly lost sight of that ultimate goal years ago.

Now having come to terms with the emptiness of Plaintiff's claims and the shoddy way in which they were prosecuted, I am reminded again of a second stanza of Eliot's that speaks to bleakness and desolation:

> What are the roots that clutch, what branches grow
> Out of this stony rubbish? Son of man,
> You cannot say, or guess, for you know only
> A heap of broken images, where the sun beats,
> And the dead tree gives no shelter, the cricket no relief,
> And the dry stone no sound of water.
> . . .
> I will show you fear in a handful of dust.[314]

Consistent with the foregoing reasoning, no genuine disputes of material fact remain. Accordingly, Defendants' motion for summary judgment is granted as to all claims.

An appropriate Order follows.

---

[314] T.S. Eliot, "The Waste Land" (1922).

BY THE COURT:


<u>/s Matthew W. Brann</u>
Matthew W. Brann
United States District Judge